## WOODSON v. SCOTT & WHITE HOSPITAL et al.

### No. 9486.

Court of Civil Appeals of Texas. Austin.
March 7, 1945.

Rehearings Denied March 28, 1945.

Cox, Brown & Daniel, of Temple, and Naman, Howell & Boswell, of Waco, for appellants.

Saulsbury, Skelton & Everton and Taylor & Taylor, all of Temple, and Sleeper, Boynton, Darden & Burleson, of Waco, for appellees.

BAUGH, Justice.

Suit by appellant against appellees for partition of certain described property in the City of Temple, Bell County, Texas. Scott & White Hospital, hereafter referred to as the Hospital, by cross action, sought specific performance against appellant of a written contract originally entered into between Temple Sanitarium and Dr. J. M. Woodson, on August 10, 1922, and several supplements thereto, which ran for a primary term of ten years from January 1, 1923; and which, under the option contained therein, and the supplements thereto, was in 1933 renewed and extended for an additional period of ten years from

December 31, 1933. The Hospital also sought judgment for a portion of certain fees collected by the Woodsons during the 10-year renewal period, which it claimed under such contract and supplements thereto. Trial was to the court without a jury and judgment rendered denying appellant partition, denying the Hospital recovery of the claimed fees, and decreeing specific performance of said contract against appellant. Dr. W. B. Woodson has appealed from the judgment adverse to him; and the Hospital from the judgment adverse to it.

The appeal involves the construction of the contract above referred to and the supplements thereto. The original contract, as stated, was between the Temple Sanitarium, a private corporation, and Dr. J. M. Woodson, and provided, among other things, that the Sanitarium convey to Dr. Woodson for $5,700 the land here involved; that Dr. Woodson should erect thereon, at his expense, a building to be known as "The Woodson Eye, Ear, Nose and Throat Hospital," a part of which was to be occupied and used by Woodson and a part by the Sanitarium; that in addition to his own patients, all patients coming to the Sanitarium needing such specialized treatment were to be sent to Woodson, that the Sanitarium would reimburse Woodson to the extent of 25% for the cost of the land and the cost of construction of such building, and would be entitled to participate to the extent of 25% in the net income from its operation. The corporate name of Temple Sanitarium was thereafter changed to Scott & White Hospital. The lot was conveyed to Woodson who erected the building. The cost of construction was greater than anticipated and by supplemental agreement, and by proper conveyances, the respective interests of the parties to the contract were changed so as to invest the Hospital with title to a 1/3 interest and the remaining 2/3 in Dr. J. M. Woodson.

Dr. J. M. Woodson died in 1930, and his sons and associates, Drs. W. B. and B. P. Woodson, succeeded to his interest; and by a third supplemental contract the Hospital waived its option under the original contract, to terminate such contract upon the death of Dr. J. M. Woodson, as provided in Sec. 16 thereof, and continued the original contract in force until December 31, 1933, with the additional proviso that the Hospital should have the option, as provided in the original contract, either to extend the contract for a period of ten years from December 31, 1933, or to purchase the interests of the Woodsons as provided in Sec. 16 of the original contract by giving the Woodsons notice of its intention six months prior to December 31, 1933. This supplemental contract was made a part of the original contract and expressly provided that the original contract should remain in full force and effect.

By a fourth supplemental contract between the Woodsons and the Hospital, dated June 10, 1932, also made a part of the original contract, all accounts between the parties up to that time were settled, and it was agreed that should the Hospital exercise its option to renew the original contract as supplemented for the additional period of ten years, then during that period the moneys to be paid by the Woodsons to the Hospital should be calculated and determined in the amounts and manner used and followed by J. M. Woodson during his lifetime, except as to the profits derived from the operation by the Woodsons of their "optical department". As to the latter, the parties bound themselves to thereafter "agree upon a basis for division of the profits, if any, to accrue from the operation of such optical department." No such agreement, however, was ever made. The Hospital seasonably gave the Woodsons written notice of its intention to renew the original contract for an additional ten-year period from December 31, 1933, and the parties continued to operate thereunder during such period. Before the expiration of the renewal period the Hospital gave the Woodsons written notice of its intention to purchase their interest under the terms of the original contract and supplements thereto. The Woodsons refused to comply; and Dr. W. B. Woodson thereafter filed this suit for partition against Dr. B. P. Woodson and the Scott & White Hospital, asserting that each of said parties owned an undivided one-third interest in said property. After suit was filed, Dr. B. P. Woodson conveyed his interest to the Hospital and filed a disclaimer. The court denied partition and decreed specific performance of the contract in favor of the Hospital against W. B. Woodson, and denied the Hospital recovery of any share in the profits from the optical department operated by the Woodsons covering the period from January 1, 1934, to December 31, 1943.

The issues thus presented involve an interpretation of the original contract and supplements thereto. The particular sections in controversy are Secs. 16, 17, 21 and 22. These sections provide:

"16. It is agreed that in the event of the death or disability of said Woodson, preventing his discharge of the professional services herein required of him, before the expiration of the terms hereof, and at all events upon the expiration of the fixed term hereof, or upon the expiration of the term hereof from whatever cause, or however effected, then in such or either of which events, this contract, the term, provisions, tenure, and term thereof may, at the option of the said Sanitarium, be annulled and terminated within twelve months following such event. That in which event the Sanitarium shall have the option and the said Woodson here now conveys to it the option and privilege, in consideration of its executing this agreement, and entering into the covenants herein contained, and because of the conveyance by it to the said Woodson of said real estate, of purchasing from said Woodson, or his estate, his or its interest in said hospital building herein agreed by the said Woodson to be erected and the said real estate on the basis of actual cost, less a reasonable allowance and deduction for depreciation, wear and tear, such allowance for depreciation, wear and tear, to be determined by a board of appraisers, composed of three disinterested citizens of Temple, one of which shall be selected by the said Woodson or his estate; one by said Sanitarium; and the two appraisers thus selected shall choose the third member of the Board, and decision of said Board, being fair and impartial, shall be binding upon the said Woodson or his estate."

"17. It is agreed that in the event said Sanitarium should cease to be operated as a medical and surgical institution for the care of patients, then this contract shall thereupon end and be of no further force or effect. In this connection it is agreed that in the event the said Woodson should become in any manner or to any extent disabled so that he could not perform or should be thereby prevented from performing or giving actual, personal assistance in the performance of the professional services herein agreed by him to be performed with reasonable diligence and skill, and if such disability should continue for two years, then and in such events, or in either of which events, the term hereof may be declared at an end, at the option of said Sanitarium, and the said Sanitarium shall be under no obligation to, in the event of such disability of the said Woodson, continue the effect or terms of this contract with his partners or associates; but in the event of such disability of the said Woodson, then if his partners or associates are entirely satisfactory to the Sanitarium and said Sanitarium and such associates of the said Woodson should be able to agree on the terms thereof, said Sanitarium will continue on such terms as may be satisfactory to it the relation initiated and created by this agreement. During any two year disability period or any part thereof, the said Woodson agrees to provide for the proper conduct, within the covenants herein contained, of said eye, ear, nose and throat hospital."

"21. The term hereof shall begin on the first day of January, A. D. 1923, and shall be fully completed and ended on the 31st day of December, A. D. 1932, except that said net income and receipts shall be apportioned and divided as hereinbefore provided and to said 31st day of December, A. D. 1932, unless the term hereof should be otherwise as herein provided sooner ended."

"22. Said Sanitarium shall have the right and option of renewing and extending this contract for a period of ten years following the expiration hereof, and, in the event said Sanitarium elects to exercise such option, it shall be binding upon the said Woodson, his partners, associates, or estate, to accept renewal and extension hereof for a period of ten years upon the same terms and conditions as in this contract set forth."

In addition to the foregoing provisions of the original contract, the parties executed a third supplemental contract, dated September 1, 1931, wherein they agreed:

"(1) Said Scott & White Hospital hereby waives its option to terminate said contract by reason of the death of the said Dr. J. M. Woodson, as provided in Section 16.

"(2) It is mutually agreed that said contract shall end and terminate on December 31, A. D. 1933.

"(3) Scott & White Hospital shall have the right and option of renewing and extending the term for a period of ten (10) years from and after December 31, A. D. 1933, as provided in Section 22 of the original contract, and shall likewise have

the option of purchasing the interest owned by B. P. Woodson and W. B. Woodson in said hospital building and grounds, as pro-. vided in Section 16 of the original contract, and either of which options it may exercise by giving the said B. P. Woodson and W. B. Woodson written notice of its intention to so exercise one of the two options so provided, and which written notice said Scott & White Hospital must cause to be delivered to B. P. Woodson and W. B. Woodson not less than six (6) months prior to December 31, 1933.

"(4) This Third Supplemental Agreement shall be attached to and become a part of said original contract, with its first and second supplements, and said original contract and all supplemental agreements heretofore entered into shall be and remain in full force and effect except as to the provisions changed by this supplemental agreement."

■ Appellant's first contention is, as we understand it, that the Hospital had lost its option to purchase said property upon the expiration of the renewal period in 1943, and that he was therefore entitled to a partition thereof. This contention is not sustained. But for the contingencies provided in Secs. 16 and 17, it is entirely clear from the provisions of Secs. 20 and 21, that the primary term of the contract was for ten years ending December 31, 1932. Had Dr. J. M. Woodson lived and not become disabled for a period of two years during this primary period, the Hospital would have had two options: (1) To purchase the property under the terms provided in Sec. 16; or (2) renew the contract for another ten-year period carrying the option at the end of that period to purchase it under the same terms. It would have been required to do one or the other. Clearly the Hospital could not, under its options, have done both,—that is, purchase the property at the end of the primary period, and then also renew the contract for another ten-year period. Appellant in effect so admits. But appellant contends that under the language of the first sentence of Sec. 16, which, because of the death of Dr. J. M. Woodson in 1930 becomes applicable here, the only options the Hospital had, were within twelve months after such death to annul and terminate the contract; and only by annulling and terminating the original contract within twelve months after the happening of the events in said sentence enumerated,

could the Hospital exercise an option to purchase the property. That is, that by the language of the second sentence of Sec. 16, "That in which event the Sanitarium shall have the option, etc." to purchase the property, the words "in which event," refer only to annulment and termination by the Hospital of the contract; and do not relate to the contingencies of death, disability, expiration of the ten-year period, or "expiration of the term hereof from whatever cause, or however effected" as being grounds for exercising an option to purchase. The language "be annulled and terminated within twelve months following such event," when applied to the event or contingency "upon the expiration of the fixed term hereof," considered in connection with the provisions of Sec. 22, which gave the Hospital the unqualified right to renew the contract at the expiration of the primary term, cannot reasonably be construed to mean that in order to acquire the right to purchase, the Hospital must first terminate the contract within twelve months after the end of the primary term. It rather indicates an intention of the parties that if none of the other named contingencies had occurred which might work a termination of the contract before the expiration of the primary period, then that the Hospital must exercise its option either to renew or to purchase within twelve months after the expiration of such primary term. Such a construction is further borne out by the terms of the third supplemental contract above quoted, made between Drs. B. P. and W. B. Woodson and the Hospital, wherein the Hospital was required to exercise its option either to renew or to purchase by giving the Woodsons written notice of its election not less than six months before the expiration of the primary term as therein extended. Obviously, this was but a modification of the provision in Sec. 16 of the original contract which gave the Hospital twelve months after the expiration of the primary term in which to exercise its option.

Whatever ambiguity or uncertainty which may have existed as to the events or contingencies enumerated in Sec. 16 of the original contract, were, we think, removed by the provisions of the third supplemental contract. By that instrument the Hospital (apparently in keeping with the provisions of Sec. 17 of the original contract) accepted Dr. J. M. Woodson's sons and associates, as parties to such contract in lieu of their father, and they therein

expressly recognized the right of the Hospital because of the death of their father, either to terminate the contract and purchase the property, or to renew the contract for another ten-year period beginning January 1, 1934, and in such renewal to keep in force the terms of the original contract and prior supplements thereto. This renewal, of course, could relate only to such provisions of the original contract as were then applicable. Obviously in such renewal for another ten-year period, the extension and continuation of the terms of the original contract could not continue in force the contingencies against death of Dr. J. M. Woodson, or his disability either under Sec. 16 or Sec. 17, or the termination of the primary period, because these events or contingencies had already transpired. The only effective provisions of Sec. 16 which a renewal for an additional ten-year period could carry forward, therefore, was the option of the Hospital to purchase the property, on the terms stated, at the expiration of the renewal period. While it is not clear what time, if any, after the expiration of the renewal period —that is, December 31, 1943—the Hospital might have in which to exercise its option to purchase the property, whether immediately, within a reasonable time, or within the one-year stated in Sec. 16 for such action, this question becomes unimportant for the reason that the Hospital gave the Woodsons notice in writing on December 11, 1942, more than a year before such termination, of its election to terminate the contract and to purchase their interest in the property. Such written notice was repeated on March 18, 1943, and again on December 15, 1943, and on January 3, 1944. Consequently appellant is in no position to complain in this regard. The option of the Hospital to purchase, on the conditions stated, was definitely fixed in the original contract; and was clearly preserved and carried forward in the renewal and extension thereof. Upon the expiration of term as extended by the renewal, the Hospital had the right to exercise its option. Consequently the court did not err in so decreeing.

The next contention made by appellant is that the contract in question is illegal and void because Scott & White Hospital, a private corporation organized for profit, was engaged as such in the practice of medicine and surgery. Preliminary to the disposition of this issue, there is presented in a supplemental brief of appellant the further contention that the court erred in excluding evidence offered by appellant to show the general medical and surgical fees collected by the Hospital between 1922 and 1943; the compensation paid by the Hospital to numerous physicians and surgeons from 1931 to 1943; statement of the assets, liabilities, and net profits of the Hospital from 1922 to 1943; and testimony as to employment by the Hospital of doctors on a salary basis. All of this was offered as tending to show a general plan of operation of the Hospital and as constituting the practice of medicine by the corporation.

The court did not err in excluding this evidence. The suit here involves a specific written contract pertaining only to one specialized type and character of the services—that of eye, ear, nose and throat practice. Whether or not that contract is ultra vires, and whether the Hospital, as a corporation, thereby became engaged in the practice of medicine must be determined, in so far as the suit upon such contract is concerned, from the terms of the contract itself. Evidence as to what other contracts the Hospital may have made with other physicians, how it may have operated other services, what it had paid other physicians, and what profits or losses it may have made or suffered from the operation of other services, would not be admissible to test the validity of the specific contract sued upon. 17 Tex.Jur., § 135, p. 388, and cases cited in footnotes. The contract in question, being specific in all its terms as to the rights and duties of the parties thereto, must be interpreted, and its validity must be determined, according to its own provisions, and not by what other contracts with other physicians relating to other services may have been.

Under the conclusions we have reached it is unnecessary for us to here determine what constitutes practice of medicine by a corporation. It may be said that the general rule is that a corporation organized for profit cannot do so; nor employ physicians as its agents to do so for it. 19 C.J.S., Corporations, § 956, p. 410; 41 Am.Jur., § 24, p. 153; People of the State of Ill., by Kerner, v. United Medical Service, Inc., 362 Ill. 442, 200 N.E. 157, 103 A.L.R. 1229, and Ann. thereunder; Bartron v. Codington County, 68 S.D. 309, 2 N.W.2d 337, 140 A.L.R. 550. Obviously, under the Medical Practice Act of Texas,

Vernon's Ann.Civ.St. Arts. 4495–4512, a license to practice medicine can be issued only to a natural person. The case of Hexter Title & Abstract Co., Inc., v. Grievance Committee, Tex.Sup., 179 S.W. 2d 946, relating to practice of law does not apply here, for the reason that it involved a course of conduct by the corporation expressly prohibited by law. On the other hand, Art. 1302, Sec. 6, RCS, authorizes formation of a corporation for the "erection and maintenance of sanatoriums," and in an approved opinion the Supreme Court held in Republic Reciprocal Ins. Ass'n v. Colgin Hospital & Clinic (a corporation), 123 Tex. 31, 65 S.W.2d 286, 287, that such corporation "was invested with implied authority, in performing its corporate functions in respect to supplying medical treatment to its patients, to employ those persons who qualify, in accordance with the provisions of article 4498, to practice medicine." It is not controverted that all persons engaged in the operation of the Woodson eye, ear, nose and throat clinic, under the contract, were licensed physicians. We think it is clear, however, that Woodson and his associates, under said contract were neither employes nor agents of the corporation. They were more in the nature of independent contractors; and the percentage of the net proceeds collected by them and paid to the Hospital was rather in the nature of rentals, and as compensation to the Hospital for services it rendered to the Woodsons in sending to them its patients needing specialized treatment and for otherwise caring for such patients.

The portions of the contract pertinent to this issue are too extensive to set out here. It is not controverted, however, that the Woodsons were entirely independent of the Hospital as to diagnosis, treatment of patients, and operations to be performed, using their own independent judgment in all such matters. They fixed and collected their own fees from their patients, kept their own books, accepted full responsibility to their patients for the nature and character of their services to them, and by express provision of the contract held the Hospital harmless against any action or claim that might be made against it growing out of malpractice, negligence, unskilled service, mistreatment of any patient, employee or visitor, etc. In brief, they retained substantially the same relationship with, and responsibility to, their patients, whether such patients came to them of their own accord, or were sent to them by the Hospital, that they would have maintained, had the contract not been made, and as if the Woodsons had operated their specialized clinic on their own responsibility. Under such circumstances we think it is clear that they did not act as agents or employees of the corporation; that their acts were not the acts of the corporation; and that the corporation as such was not engaged, in so far as said contract is concerned, in practicing medicine through them as its agents.

■ By cross assignment the Hospital complains of that portion of the trial court's judgment denying it recovery of 25% of the profits from the operation by the Woodsons of their optical department during the renewal period of said contract—that is, from 1934 through 1943. The original contract did not specifically provide for division of the profits from this character of service. However, Dr. J. M. Woodson, during his lifetime, remitted to the Hospital 25% of the net profits from the optical department; and under the fourth supplemental agreement, made June 10, 1932, whereby the primary term of the original contract was extended to December 31, 1933, and prior accounts were therein settled, Drs. W. B. and B. P. Woodson agreed to continue such division of the profits from the optical department up to December 31, 1933. However in that supplemental agreement it was expressly provided that in the event the Hospital elected to renew the contract for another ten-year period from and after January 1, 1934, "then, and in the event of such election, it is expressly understood and agreed by the parties hereto that Parties of the Second Part may continue to operate an optical department in conjunction with their other department, but the basis fixed herein for the rents to accrue from such optical department in favor of First Party shall not apply, and the parties hereto shall then agree upon a basis for a division of the profits, if any, to accrue from the operation of such optical department."

This provision, we think, manifests a clear intention of all parties thereto, to exclude the fees derived from the optical department, from the percentage of division applicable to fees derived from other departments conducted by the Woodsons; and leaves the determination of the division of these fees entirely to future agreement. The very fact that this particular

department was specifically excepted from the ratio applicable, under the contract, to other departments, clearly negatives, rather than implies, that in the event of failure to subsequently agree on a division of these particular fees, the ratio fixed as to other departments should apply to the optical department. Thus the matter as to a division of these fees was left entirely open to future determination, without any standard prescribed to determine in what proportions that division should be made. The situation thus presented is not analogous to that arising in the cases relied upon by appellee, particularly Joy v. St. Louis, 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843, and Burger v. Ray, Tex.Civ.App., 239 S.W. 257, wherein one of the parties agreed to do a specific thing without agreeing on the price or value of the service; but such price or value was readily ascertainable according to well known or fixed standards. The issue here presented is not that of the reasonable value of optometric or optical services rendered to such patients; but what would be the proper division of the net profits therefrom between the Woodsons and the Hospital. And since the parties have by express agreement excluded the division of these particular fees from the standard or ratio applicable to the division of other fees, and merely left to future agreement such division, no standard is afforded whereby to determine a proper division thereof. The result is that there is presented merely an agreement to enter into a future agreement without any provisions as to what the terms of such future agreement should be. The rule approved in Radford v. McNeny, 129 Tex. 568, 104 S.W.2d 472, 475, is here applicable: "So, to be enforceable, a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations." See also 12 Am. Jur., § 24, p. 521.

The foregoing conclusion renders unnecessary a discussion of the issues of limitation as to the fees collected more than four years prior to suit; also the issue of waiver by the Hospital in not demanding division of such optical fees until after this suit was filed; though appellant had notified appellee in 1934 that such fees were not included in his remittances to the Hospital and would not thereafter be included. The Hospital made no protest over the failure by the Woodsons during the entire ten-year period to include any part of the net proceeds from the optical department in their monthly and annual payments to the Hospital under said contract; and only made demand therefor after this suit was filed.

Finding no error in the record the judgment of the trial court is affirmed.

Affirmed.