**FLYNN BROTHERS, INC., et al., Appellants,**

**v.**

**FIRST MEDICAL ASSOCIATES, et al., Appellees.**

No. 05–85–00586–CV.

Court of Appeals of Texas, Dallas.

July 31, 1986.

Rehearing Denied Sept. 10, 1986.

Larry D. Flynn, Dallas, for appellants.

Robert E. Wilbur, William V. Counts, Jr., Dallas, for appellees.

Before AKIN, HOWELL and HOLL-INGSWORTH, JJ.

HOLLINGSWORTH, Justice.

Appellants, Flynn Brothers, Inc., David Flynn, and Bennie Flynn (collectively referred to as FBI) appeal from a take-nothing judgment in both their countersuit for breach of contract and tortious interference with business relations against appellees First Medical Associates (FMA) and Frank J. Adcock, III, M.D. and their third-party action for fraud, breach of fiduciary duties, and wrongful interference with business relations against appellee W. Phillip Keene M.D. Appellants bring forward 35 points of error in which they assert that the trial court erred in: (1) failing to render judgment against FMA for breach of contract, breach of partnership agreement, breach of fiduciary duty, and tortious interference with business relations; (2) failing to render judgment against Dr. Keene for fraud, breach of fiduciary duty, and wrongful interference with business relations; (3) granting FMA's application for injunctive relief against FBI; (4) finding that FMA

was entitled to an accounting from FBI; and (5) failing to timely file findings of fact and conclusions of law. Because we hold that the contracts sued upon are illegal and unenforceable, we affirm the trial court's judgment.

In the summer of 1981, the Flynn brothers became aware that St. Paul Hospital of Dallas was interested in contracting with an outside party to staff its emergency department. Upon learning this, David Flynn contacted his friend, Dr. Adcock, who at this time was an emergency physician in Tennessee. He proposed that they form a company to bid on and, if acquired, operate the St. Paul contract. The Flynns proposed forming a partnership with Dr. Adcock in which profits and losses would be split 80% to the Flynns and 20% percent to Dr. Adcock. The partnership agreement was not reduced to writing.

In the fall of 1981, the St. Paul contract was awarded to the Flynns and Dr. Adcock. After this contract was obtained, the parties became aware that it was invalid under article 4495b[1] ("Texas Medical Practices Act") because the Flynn brothers were not licensed to practice medicine. In an effort to meet the strictures of the Texas Medical Practices Act, Dr. Adcock formed a professional corporation, FMA, which became the contracting party with St. Paul. The Flynns formed a corporation, FBI, which entered into an exclusive management agreement under which FBI administered the St. Paul contract. The parties further agreed that FBI was the exclusive management agent of FMA and that Dr. Adcock could not sell his interest in FMA to the detriment of FBI or contract with any party other than FBI for the management of FMA. In exchange for management services, FBI was to receive 66.67% of FMA's net profits. In addition to the St. Paul contract, FBI also solicited a contract on behalf of FMA to staff the emergency department of Hopkins County Memorial Hospital.

All revenues from these accounts were sent directly to FBI offices to be deposited

1. All references are to TEX.REV.CIV.STAT. ANN. art. 4495b et seq. (Vernon Supp.1986).

into the FMA checking account maintained by FBI. Throughout this relationship, commingling of funds in the FMA and FBI accounts was commonplace. FBI also pledged the contract rights and other assets of FMA to secure a pre-existing FBI debt at First National Bank of Irving. Furthermore, money from FMA's account was from time to time transferred to Bennie Flynn's personal account at the bank.

In July 1983, Dr. Adcock wished to sell his interest in FMA to Dr. Keene and from July 1983 until January 1984 FBI negotiated with Dr. Keene concerning the transfer of Dr. Adcock's interest in FMA to Dr. Keene. An agreement could not be reached and in January 1984 the parties ceased negotiations. FBI then informed Dr. Adcock that another doctor had been found to purchase his interest in FMA, but Dr. Adcock refused to sell his interest to this doctor.

On January 10, 1984, one day after Dr. Adcock had telephoned the administrator of St. Paul and discussed with her the problems at FBI, St. Paul sent a letter to FBI and FMA saying it considered FMA to be in breach of contract with St. Paul. Under the terms of the contract, St. Paul was to give FMA written notice of any specific breaches of the contract, and FMA had 30 days to cure the breaches.

On January 18, 1984, FMA gave FBI written notice of termination of the contract with FBI effective that day. The next day FMA filed suit against FBI alleging breach of contract, breach of fiduciary duty, and tortious interference of contract. FBI counterclaimed alleging breach of contract, fraud, breach of fiduciary duty, and tortious interference of contract. Trial was to the court, and at the close of evidence the trial judge rendered a take-nothing judgment against both FBI and FMA and Adcock on their claims but granted FMA injunctive relief and an accounting from FBI.

Our threshold question is whether the agreements made by the parties were illegal and, if so, whether this point has been adequately preserved on appeal. Address-ing the second part of the question first, rule 94 of the Texas Rules of Civil Procedure provides that illegality is an affirmative defense to be pleaded by the party claiming such defense. Failure to plead illegality of a contract ordinarily constitutes a waiver of the defense. *Kirby v. Cruce*, 688 S.W.2d 161, 168–69 (Tex.App.—Dallas 1985, writ ref'd n.r.e.); *Lawler v. Aramco, Inc.*, 447 S.W.2d 189, 193 (Tex. Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.). Where the illegality of the contract appears on the face of the contract or the illegality appears from the evidence necessary to prove the contract, an affirmative pleading of illegality is unnecessary and the question of illegality can be raised at any stage of the proceeding, or may be raised by the appellate court sua sponte. *Lewkowicz v. El Paso Apparel Corp.*, 625 S.W.2d 301, 303 (Tex.1981); *After Hours, Inc. v. Sherrard*, 456 S.W.2d 227, 228 (Tex. Civ.App.—Austin 1970), *rev'd on other grounds*, 464 S.W.2d 87 (Tex.1971).

■ FMA pleaded illegality as an affirmative defense at trial with respect to the management contract but has not raised this issue on appeal. FMA did not plead illegality at trial as an affirmative defense to an alleged oral partnership agreement between FMA and FBI but has raised this issue on appeal. Because the illegality of these agreements is apparent from the face of the management contract and from the proof needed to show the existence of the partnership, we hold that the issue of illegality has not been waived. *Lewkowicz*, 625 S.W.2d at 303; *After Hours, Inc.*, 456 S.W.2d at 229.

Article 4495b, section 3.07(f) provides: "It shall be unlawful for any person to do any act described in subdivision (1), (8), (9), (10), (11), (12), (13), or (15) of section 3.08 of this act." Section 3.08(15) prohibits aiding and abetting, directly or indirectly, the practice of medicine by any person, partnership, association, or corporation not duly licensed to practice medicine.

The constitutionality of the predecessor statute to the Texas Medical Practices Act was challenged in *Garcia v. Texas State*

*Board of Medical Examiners,* 384 F.Supp. 434, 436 (W.D.Tex.1974). In upholding the constitutionality of the act, the court noted that the Texas statutes were designed to preserve the vitally important doctor-patient relationship and prevent possible abuses resulting from lay control of corporations employing licensed physicians to practice medicine. In addressing this problem the court wrote:

> Without licensed, professional doctors on Boards of Directors who and what criteria govern the selection of medical and paramedical staff members? To whom does the doctor owe this first duty—the patient or corporation? Who is to preserve the confidential nature of the doctor-patient relationship? What is to prevent or who is to control a private corporation from engaging in mass media advertising in the exaggerated fashion so familiar to every American? Who is to dictate the medical and administrative procedures to be followed? Where do budget considerations end and patient cure begin?

*Garcia,* at 440.

■ The concerns expressed by the court in *Garcia* are present in our case as FBI and FMA had problems over the issues of staff selection and advertising. Under the management contract FBI had the right to 66.67% of the profits of Dr. Adcock's medical practice, the right to trade and commercialize on Dr. Adcock's license, and the right to select medical staff to work in the hospitals under contract, all in contravention of the Medical Practices Act.

■ Under the Medical Practices Act and its predecessors, when a corporation comprised of lay persons employs licensed physicians to treat patients and the corporation receives the fee, the corporation is unlawfully engaged in the practice of medicine. *Watt v. State Board of Medical Examiners,* 303 S.W.2d 884, 888 (Tex.Civ. App.—Dallas 1957, writ ref'd n.r.e.) *cert. denied,* 356 U.S. 912, 78 S.Ct. 669, 2 L.Ed.2d 585 (1958); *Rockett v. State Board of Medical Examiners,* 287 S.W.2d 190,

192 (Tex.Civ.App.—San Antonio 1956, writ ref'd n.r.e.).

Although it is true that Dr. Adcock was not an "employee" of FBI under their agreement, the practical effect was the same. FBI would endeavor to get hospitals to contract with FMA and, in exchange, FMA gave to FBI 66.67% of the profits made through Dr. Adcock's practice. FBI also was empowered to hire staff for FMA to use in the hospitals under contract. In effect, Dr. Adcock allowed FBI to use his license to get contracts to provide emergency medical care and staff for hospital emergency rooms in exchange for which FBI received the majority of profits made through Dr. Adcock's practice of medicine, thereby indirectly allowing FBI to practice medicine without a license. The parties admit that the whole contractual scheme was developed to do indirectly that which they freely concede they could not do directly under the Medical Practices Act. The design, effect, and purpose of the management agreement contravenes the Medical Practices Act and therefore will not be enforced by the courts of this state. *Lewis v. Davis,* 145 Tex. 468, 477, 199 S.W.2d 146, 151 (Tex.1947); *Woolsey v. Panhandle Refining Co.,* 131 Tex. 449, 455, 116 S.W.2d 675, 678 (Tex.1938); *Baron v. Mullinax, Wells, Mauzy and Baab, Inc.,* 623 S.W.2d 457, 461 (Tex.App.—Texarkana 1981, writ ref'd n.r.e.); *Wilson v. Teacher Retirement System of Texas,* 617 S.W.2d 329, 332 (Tex.App.—Amarillo 1981, no writ). The oral "partnership" agreement alleged by FBI to exist between the parties is invalid as well for the reasons stated above.

■ When an attempt is made to bring an action upon an illegal contract, the courts of this state have uniformly held that they will leave the parties where they found them. *Araiza v. Chapa,* 319 S.W.2d 742, 743 (Tex.Civ.App.—San Antonio 1958, writ ref'd n.r.e.). We shall do the same.

For the reasons above stated, the judgment of the trial court is affirmed. It is

ordered that each party pay its own costs in the trial court and of this appeal.