Shailesh GUPTA, M.D., Appellant

v.

EASTERN IDAHO TUMOR INSTITUTE, INC., Mukund Shah, M.D., Hesaraghatta Shamasunder, M.D., S.R. Venkatesh, M.D., Balchander Rao, M.D., Vinod Bhucar, M.D., and Arvind Bhandari, M.D., Appellees.

No. 14–00–00079–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 17, 2004.

Thomas W. McQuage, Galveston, for Appellant.

Daniel Prescott McManus, Houston, and Dermot Rigg, Sugar Land, for Appellees.

Panel consists of Justices ANDERSON, SEYMORE, and MURPHY.*

## OPINION

JOHN S. ANDERSON, Justice.

Shailesh Gupta appeals the jury verdict rendered in favor of Eastern Idaho Tumor Institute, Inc. for damages based on breach of fiduciary duty. Appellant contends the contract, on which the damages are based, is unenforceable because (1) the contract is illegal on its face; (2) a condition precedent was not satisfied; and (3) the non-assignment clause contained in the contract was violated. We affirm.

### FACTUAL BACKGROUND

Northwest Radiation Medical Group, Ltd. ("Northwest") is a California limited partnership created in 1991 by four Texas doctors and two California doctors for the purpose of opening a radiation oncology clinic in the Houston area. The six doctors purchased land, the necessary equipment, and built a specialized building needed to house the special equipment. In order to comply with federal law, the four Texas doctors sold their interest in Northwest to the two California doctors, retaining only an interest in the land and the building.[1] The clinic was open for approximately two years, from 1992 to 1994, after which Northwest attempted to either sell the clinic or find another doctor to operate it.

In the summer of 1995, appellant began negotiations with Northwest to start his radiation oncology practice in their vacant, but furnished, building. The parties entered into a joint venture agreement effective September 1, 1995, whereby appellant would "provide, and be solely responsible for the payment of ... all necessary professional, medical, and administrative staffing necessary for the successful operation of the Joint Venture," and Northwest would "contribute all necessary equipment, office space, and machinery required for the successful operation of the Joint Venture." The parties further agreed to di-

---

* Senior Chief Justice Paul C. Murphy sitting by assignment.

1. 42 U.S.C.A. § 1395nn, entitled Limitation on Certain Physician Referrals, prohibits a doctor from referring a patient to an entity for treatment if the doctor retains an ownership interest in that entity. (West 2003). Thus, in order to comply, the Texas doctors, all of whom practice in Houston, sold their interest in the partnership to ensure they could continue to send patients to the clinic.

vide the gross revenues of the joint venture equally.

Pursuant to the agreement, the billings, collections, and accounts payable were to be handled by a third-party, Gamma Management, Inc. ("Gamma"), unless and until appellant provided written notice of intent to perform the billing himself. Gamma was controlled by Northwest, but the two companies were consolidated into Eastern Idaho Tumor Institute, Inc. ("EITI") in the fall of 1995. After the consolidation, EITI took over the billing, collections, and accounts payable on behalf of Gamma. Appellant prepared the billing records and then sent the applicable information to EITI, so it could file the appropriate medical claims with medicare, the insurance companies, and the patients. Each month, EITI would send appellant a check for his one-half share of the gross revenues.

The relationship between appellant and EITI began to deteriorate when appellant stopped sending billing information to EITI. Eventually, appellant started performing the billing for the clinic himself; however, appellant did not split the gross revenues received with EITI for the operation of the clinic during the remaining term of the joint venture. In September 1996, the joint venture's one-year term expired and the parties began negotiating for appellant either to enter into a long-term lease for the building and equipment or to purchase the property. Negotiations continued for several months, during which time, appellant did not pay any rent for the property or equipment and did not divide any of the gross revenues received.

Appellant contends he agreed to open the clinic only because the four Texas doctors promised to refer patients to the clinic. On cross-examination, appellant admitted that no such agreement was in writing; rather, he claimed it was implied. According to appellant, the clinic began to decline steadily when the Texas doctors stopped referring patients to his clinic. Two of the six doctors testified at trial—one Texas doctor and one California doctor—there was no agreement for the Texas doctors to refer patients to appellant once appellant began operating the clinic.

EITI attempted on numerous occasions to evict appellant from the clinic, but because appellant was continuing to treat patients, it withdrew those attempts.[2] According to a representative of EITI, appellant promised to stop taking new patients and that as soon as all the treatments from his existing patients were concluded, he would vacate the premises. This situation continued for nearly one year before appellant voluntarily vacated the premises in May 1998.

PROCEDURAL HISTORY

EITI filed suit against appellant alleging breach of the joint venture agreement, breach of fiduciary duty, past-due rent, and termination of the joint venture agreement. It also asked the court to require appellant to give an accounting to EITI and declare the rights of the parties under the agreement. Appellant answered, filed a counterclaim against EITI, and filed a third-party petition against the four Texas doctors, the two California doctors, and Gamma. With respect to EITI, the jury found appellant failed to comply with the joint venture agreement, failed to comply with his fiduciary duties owed to EITI, and was liable for rental damages for the equipment. The jury awarded EITI $247,997 in damages, of which $62,497 rep-

---

2. The typical patient received radiation treatments five days a week over a six to eight week period. Appellant would not provide *the patients' names to EITI; therefore, EITI* withdrew its attempts to evict appellant so that it did not interfere with appellant's use of the premises and ensured continuity in the *patient's treatment.*

resented damages for breach of fiduciary duty. The jury also awarded the six doctors $67,200 for unpaid rent for the premises. The trial court rendered its final judgment in accordance with the jury's verdict on September 30, 1999.

Appellant filed his first motion for new trial on October 29, 1999 and, after obtaining new counsel, filed a second motion for new trial on November 1, 1999. The trial court overruled appellant's motion for new trial on December 10, 1999.[3] Thereafter, appellant filed a notice of appeal on December 29, 1999; the appeal, however, was stayed pending the outcome of bankruptcy proceedings initiated by appellant. On February 19, 2003, the bankruptcy judge granted EITI's motion for summary judgment, holding the debt owed by appellant to EITI for breach of fiduciary duty in the amount of $62,497 was non-dischargeable. Appellant then continued his appeal before this court on that portion of the damages awarded by the trial court for breach of fiduciary duty.[4]

In three issues, appellant challenges the judgment of the trial court. Appellant argues the joint venture agreement is unenforceable because (1) it is based on illegal conduct, namely the corporate practice of medicine; (2) a condition precedent was unfulfilled; and (3) Northwest transferred its interest in the joint venture agreement to EITI without his knowledge or approval in violation of the agreement. Accordingly, appellant contends EITI is prohibited from collecting any damages for breach of fiduciary duty because the contract is void.

## DISCUSSION

### I. Illegality of Contract

In his first issue, appellant contends the joint venture agreement is unenforceable because it allows the corporate practice of medicine in violation of the Texas Medical Practice Act.[5] See Act of May 30, 1993, 73rd Leg., R.S., ch. 862, § 17, 1993 Tex. Gen. Laws 3374, 3388 (repealed and recodified 1999) (current version at TEX. OCC. CODE ANN. § 164.052(a)(17) (Vernon 2004)). Appellant argues the fee-splitting provision found in the joint venture agreement is illegal because it effectively allows a corporation—EITI (an Idaho corporation) as successors in interest to Northwest (a California partnership)—to practice medicine in Texas, thereby violating the Medical Practice Act.

As a general rule, a contract to do a thing which cannot be performed without a violation of the law is unenforce-

---

**3.** The trial court generally denied appellant's motion for new trial without specifically referring to either motion.

**4.** Appellant has named as parties to this appeal EITI and the six doctors involved in the joint venture agreement. Appellant, however, only challenges the trial court's judgment relating to breach of fiduciary duty. EITI is the only party to whom the jury determined appellant breached a fiduciary duty and is the only party that was awarded damages for such breach. Accordingly, appellant and EITI are the only proper parties to this appeal, and the only parties affected by our decision.

**5.** EITI contends we do not need to decide the issue of illegality because (1) appellant waived the defense of illegality by not pleading it at trial, and (2) there was evidence of the existence of a fiduciary relationship separate and apart from the joint venture agreement. With regard to waiver, we have reviewed the record and determine the issue of illegality was tried by consent because the evidence at trial was developed under circumstances indicating both parties understood that legality of the joint venture agreement was at issue. TEX.R. CIV. P. 67; see Johnston v. McKinney Am., Inc., 9 S.W.3d 271, 281 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). Additionally, because we hold the joint venture agreement is valid, we do not need to determine whether evidence supports the existence of a fiduciary relationship separate and apart from the agreement.

able. *Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex.1991); *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 148–49 (1947); *In re Kasschau*, 11 S.W.3d 305, 312 (Tex.App.-Houston [14th Dist.] 2000, orig. proceeding). The purpose of this rule is to benefit and protect the public, not to protect or punish either party to the contract. *Lewis*, 199 S.W.2d at 151; *Villanueva v. Gonzalez*, 123 S.W.3d 461, 464 (Tex.App.-San Antonio 2003, no pet.); *Kasschau*, 11 S.W.3d at 312. A contract that could have been performed in a legal manner will not be declared void because it may have been performed in an illegal manner. *Lewis*, 199 S.W.2d at 149. Where two constructions of a contract are possible, courts give preference to the construction that does not violate the law. *Montgomery v. Browder*, 930 S.W.2d 772, 781 (Tex.App.-Amarillo 1996, writ denied); *Cross v. Dallas County Flood Control Dist. No. 1*, 773 S.W.2d 49, 53 (Tex.App.-Dallas 1989, no writ). Additionally, we presume the contracting parties are knowledgeable of the law and contract accordingly; thus, "where the illegality does not appear on the face of the contract, it will not be held void unless the facts showing its illegality are before the court." *Lewis*, 199 S.W.2d at 149; *see Kasschau*, 11 S.W.3d at 312.

█ The Medical Practice Act prohibits a physician from "aiding or abetting, directly or indirectly, the practice of medicine by a person, partnership, association, or corporation not duly licensed to practice medicine by the board." Act of May 30, 1993, 73rd Leg., R.S., ch. 862, § 17, 1993 Tex. Gen. Laws 3374, 3388 (repealed and recodified 1999). A person "practices medicine" under the Medical Practice Act when that person

(A) ... publicly profess[es] to be a physician or surgeon and ... diagnose[s], treat[s], or offer[s] to treat any disease or disorder, mental or physical, or any physical deformity or injury by any system or method or to effect cures thereof; or

(B) ... diagnose[s], treat[s], or offer[s] to treat any disease or disorder, mental or physical, or any physical deformity or injury by any system or method and to effect cures thereof and charge therefor, directly or indirectly, money or other compensation.

Act of July 24, 1981, 67th Leg., 1st C.S., ch. 1, § 1, 1981 Tex. Gen. Laws 1, 3 (repealed and recodified 1999) (current version at TEX. OCC.CODE ANN. 151.002(a)(13) (Vernon 2004)). Under the Medical Practice Act, when a corporation comprised of lay persons employs licensed physicians to treat patients and the corporation receives the fee, the corporation is unlawfully engaged in the practice of medicine. *Flynn Bros., Inc. v. First Med. Assocs.*, 715 S.W.2d 782, 785 (Tex.App.-Dallas 1986, writ ref'd n.r.e.); *Watt v. Tex. State Bd. of Med. Exam'rs*, 303 S.W.2d 884, 887 (Tex. Civ.App.-Dallas 1957, writ ref'd); *Rockett v. Tex. State Bd. of Med. Exam'rs*, 287 S.W.2d 190, 191–92 (Tex.Civ.App.-San Antonio 1956, writ ref'd n.r.e.); *see Guerrero–Ramirez v. Tex. State Bd. of Med. Exam'rs*, 867 S.W.2d 911, 920–21 (Tex. App.-Austin 1993, no writ). The purpose of this act is to preserve the vitally important doctor-patient relationship and prevent possible abuses resulting from lay control of corporations employing licensed physicians to practice medicine. *Flynn Bros. Inc.*, 715 S.W.2d at 785; *Garcia v. Tex. State Bd. of Med. Exam'rs*, 384 F.Supp. 434, 438–39 (W.D.Tex.1974).

█ The joint venture agreement, effective September 1, 1995, between Northwest and appellant provides that the name of the joint venture shall be "Northloop Radiation Therapy Center," formed for the specific purpose of providing radiation therapy to cancer patients. Other relevant portions of the agreement include:

5. Capital and Functions of Each Joint Venturer. Neither party hereto is contributing any initial capital in the formation of this Joint Venture. Rather, the roles and functions of each Joint Venture[r] is delineated herein as follows, with such role and function only to be modified in writing upon unanimous agreement of each party hereto:

a) Gupta shall provide, and be solely responsible for the payment of (including all payroll taxes), all necessary professional, medical, and administrative staffing necessary for the successful operation of the Joint Venture; ...

c) Northwest shall contribute all necessary equipment, office space, and machinery required for the successful operation of the Joint Venture; ...

6. Income and Loss. The gross revenue of the Joint Venture shall be divided equally to one half for each party hereto. In this regard, the parties agree that all billings, collections and accounts payable shall be handled by Gamma Management, Inc. from its offices located at 867 West Lancaster Blvd[.], Lancaster California. Gamma shall open a bank account for the Joint Venture at a bank mutually agreed upon by the parties. Distributions of revenue, if any, under this Paragraph shall occur on the last day of the month in which collections are received. [If a]fter ninety (90) days from the date of this Agreement, Gupta desires to perform the billing himself for the Joint Venture, he may notify Northwest in writing at least thirty days prior to the commencement of such activity of his intent to perform same. All billing function[s] performed by Gupta hereunder, if any, shall be at the direction and su-

pervision of Northwest and/or Gamma Management, Inc.

Appellant relies on *Flynn Brothers*, to support his contention that the contract provision was illegal. In *Flynn*, the appellants entered into a partnership with a doctor whereby the appellants acted as the doctor's exclusive management agent with the rights to (1) collect 66.67% of the profits, (2) trade and commercialize on the doctor's license, and (3) select the medical staff to work in the hospitals under contract. 715 S.W.2d at 783, 785. The partnership arrangement was created in an effort to meet the requirements of the Medical Practice Act and avoid the practice of medicine by a non-doctor. *Id.* at 783. Although the parties were technically partners, the amount of control the appellants exercised over the doctor's practice rendered their relationship more of an employer/employee relationship. *Id.* at 785. The effect of their arrangement was to allow the appellants to use the doctor's license to get contracts to provide emergency medical care and to hire staff for the hospital emergency rooms, and, in exchange, the appellants received the majority of profits made through the doctor's practice of medicine. *Id.* The court concluded that "[t]he design, effect, and purpose of the management agreement contravene[d] the Medical Practices Act" and therefore was unenforceable. *Id.*

Appellant argues that, like the parties in *Flynn*, he and Northwest, EITI's predecessor, entered into an illegal contract, which allowed a partnership, composed of doctors not licensed to practice in this state, to receive one-half of the gross revenues from appellant's radiation oncology practice. Appellant also argues the joint venture structure does not disguise the effect of the agreement, which is an attempt to indirectly commit the unlawful corporate or unlicenced practice of medi-

cine. Thus, appellant concludes the joint venture agreement is unenforceable because it violates the Medical Practice Act.

*Flynn*, however, is distinguishable because EITI's relationship with appellant did not rise to the level of control present in *Flynn*. Here, EITI was not permitted to trade or commercialize on appellant's license. Here, appellant had the authority to hire and fire his medical staff as he saw fit. Indeed, appellant complained EITI failed to provide additional staff to help prepare the billing. EITI's representatives testified their frustrations with appellant stemmed from the manner in which he chose to run his practice, further demonstrating appellant was given full control over his practice. Specifically, EITI's initial function under the contract was to collect the billing receipts from medicare, insurance agencies, and individuals. EITI preferred and requested that appellant provide billing records on a daily basis, so that the stream of income would be constant and the strict billing requirements of the government and insurance agencies would be followed. Appellant, however, preferred to complete the billing records at the end of the treatment cycle, which occurred after six to eight weeks of treatment. EITI complied with appellant's wishes and collected the billing receipts on appellant's terms.

The joint venture agreement also provided that each party had the right to engage in other business opportunities, regardless of whether the other opportunities were in direct competition with the joint venture. The parties were not required to offer the opportunity to the joint venture and were not required to share

any profits, which further demonstrates the parties' agreement and intentions that appellant would have full control over his practice, sharing only in the profits associated with the joint venture.

In *Watt v. Texas State Board of Medical Examiners*, 303 S.W.2d 884 (Tex.Civ.App.-Dallas 1957, writ ref'd) and *Rockett v. Texas State Board of Medical Examiners*, 287 S.W.2d 190 (Tex.Civ.App.-San Antonio 1956, writ ref'd n.r.e.), the courts determined the doctors were permitting or allowing non-doctors to use their licenses to practice medicine. *Watt*, 303 S.W.2d at 887; *Rockett*, 287 S.W.2d at 191. In each of these cases, the doctor worked for a clinic owned by non-doctors and was paid a set salary for rendering his services. *Watt*, 303 S.W.2d at 887; *Rockett*, 287 S.W.2d at 191. The clinics charged and collected all the fees on behalf of the doctors, and the clinics had the right to fire the doctors as they saw fit. *Watt*, 303 S.W.2d at 887; *Rockett*, 287 S.W.2d at 191. Additionally, in *Watt*, the clinic was placing advertisements on behalf of the doctor. *Watt*, 303 S.W.2d at 886. In each case, the court determined the doctor's actions permitted or allowed another to use the doctor's license or certificate to practice medicine for the purpose of treating or offering to treat, sick, injured, or afflicted human beings, in contravention of the Medical Practice Act.[6] *Watt*, 303 S.W.2d at 887; *Rockett*, 287 S.W.2d at 191.

This case is more closely aligned with *Woodson v. Scott & White Hospital*, 186 S.W.2d 720 (Tex.Civ.App.-Austin 1945, writ ref'd w.o.m.). In *Woodson*, Dr. J.M. Woodson entered into a contract with

---

**6.** The provision found in the predecessor statute to the Medical Practice Act, on which *Watt* and *Rockett* rely, is substantially the same. *Compare* Act of May 30, 1993, 73rd Leg., R.S., ch. 862, § 17, 1993 Tex. Gen. Laws 3374, 3388 (repealed and recodified 1999) *with Watt*, 303 S.W.2d at 885 (quoting

the Texas Medical Practice Act which prohibited "[t]he impersonation of a licensed practitioner, or permitting, or allowing another to use his license, or certificate to practice medicine in this State, for the purpose of treating, or offering to treat, sick, injured, or afflicted human beings").

Temple Sanitarium ("Temple"), in which Temple agreed to convey a piece of property to Dr. Woodson and Dr. Woodson agreed to erect, at his expense, a building to be known as "The Woodson Eye, Ear, Nose and Throat Hospital." *Id.* at 721. Pursuant to the contract, Dr. Woodson would occupy one portion of the building and Temple would occupy the remaining portion. *Id.* Temple agreed to refer all patients needing specialized treatment to Dr. Woodson and to reimburse Dr. Woodson twenty-five percent of the cost of the land and the cost to construct the building. *Id.* The parties further agreed Temple would be entitled to twenty-five percent of the net income from Dr. Woodson's practice. *Id.* The contract allowed Temple to exercise an option to purchase Dr. Woodson's interest in The Woodson Eye, Ear, Nose and Throat Hospital when the contract expired. *Id.* Temple thereafter changed its corporate name to Scott & White Hospital ("Hospital"). *Id.* However, because the cost of construction was greater than anticipated, the parties amended the contract to give the Hospital a one-third interest in Dr. Woodson's practice. *Id.*

During the term of the contract, Dr. Woodson passed away, but his sons and associates, Drs. W.B. and B.P. Woodson, succeeded to his interest, and the Hospital continued the contract with Dr. Woodson's sons. *Id.* Nearly ten years later, the Hospital gave Drs. W.B. and B.P. Woodson written notice of its intent to purchase their interest under the terms of the contract; however, W.B. Woodson refused to comply. *Id.* W.B. Woodson filed a lawsuit to partition his interest from the Hospital, and the Hospital counterclaimed for specific performance of the contract. *Id.* W.B. Woodson contended the contract the Hospital sought to enforce was illegal and void because it allowed the Hospital, a private corporation, to engage in the practice of medicine. *Id.* at 724.

The *Woodson* court held the contract was enforceable because the doctors' relationship with the Hospital was more in the nature of an independent contractor and not an agent or employee. *Id.* at 725. The court held the splitting of gross revenues was merely payment of rent and compensation for the Hospital's referral services. *Id.* Important to the court's decision was the fact that:

> the Woodsons were entirely independent of the Hospital as to diagnosis, treatment of patients, and operations to be performed, using their own independent judgment in all such matters. They fixed and collected their own fees from their patients, kept their own books, accepted full responsibility to their patients for the nature and character of their services to them … Under such circumstances we think it is clear that they did not act as agents or employees of the corporation; that their acts were not the acts of the corporation; and that the corporation as such was not engaged, in so far as said contract is concerned, in practicing medicine through them as its agents.

*Id.* at 725.

Unlike *Flynn, Watt,* and *Rockett,* EITI did not exercise the level of control over appellant that made their relationship, in effect, one of employer/employee. EITI did not have the exclusive management rights over appellant's license and did not enter into contracts with third parties for appellant to provide his medical services. Appellant and his chosen staff provided the medical services as he desired, appellant prepared the billing in the manner he chose, and then appellant provided the billing records to EITI for collection pursuant to his timetables. Appellant, however, eventually took over the billing aspect as well. EITI provided appellant with one-half the gross revenues received, but when

appellant began collecting billing receipts, he did not provide gross revenue splitting as EITI had done.

Appellant was completely independent of EITI as to diagnosis, treatment, and operation of the clinic, using his own judgment in all such matters. Appellant fixed his own fees, kept his own books, and was fully responsible to his patients for the nature and character of his services rendered to them. Under these circumstances, the parties' relationship is more that of an independent contractor and not that of an employer/employee. We hold EITI was not engaged in the corporate practice of medicine, and therefore, the joint venture agreement was valid. Accordingly, we overrule appellant's first issue.

## II. Breach of Contract

In his second and third issues, appellant contends the joint venture agreement is unenforceable because EITI breached the contract by (1) failing to fulfill a condition precedent and (2) receiving its interest in the joint venture agreement by assignment in violation of the agreement's non-assignability provision.

Appellant's argument is based on the following two provisions contained in the joint venture agreement:

- This document becomes valid only if the attached amendment is also signed by both parties and the sum of $18,000 is delivered to Shailesh Gupta as noted per terms of the promissory note.
- Assignment. Because of the personal relationship between the parties hereto, each is specifically prohibited from selling, assigning, transferring, or hypothecating his/its interest in the Joint Venture, or the Joint Venture's assets to any person, firm or corporation, other than the other parties hereto, nor may the interest of any of the parties in the Joint Venture or the

Joint Venture's assets be transferred by operation of law, except upon the death of Gupta.

If a contract is unambiguous, the court must interpret the contract and determine whether a party has breached the contract as a matter of law. *Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex.App.-Houston [14th Dist.] 1996, writ denied); *Garza v. Southland Corp.*, 836 S.W.2d 214, 219 (Tex.App.-Houston [14th Dist.] 1992, no writ). A trial court should not submit a pure question of law to the jury, but it may submit a question that asks the jury to resolve a factual dispute regarding a party's failure to perform according to the terms of the contract. *Meek*, 919 S.W.2d at 808; *Lindgren v. Delta Invs.*, 936 S.W.2d 422, 427 (Tex.App.-Austin 1996, writ denied). When the evidence is undisputed or the evidence conclusively proves performance or non-performance of the contract terms, the trial court should not submit the issue to the jury. *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 432 (Tex.App.-Houston [14th Dist.] 1998, pet. denied).

Generally, when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex.2004). The non-breaching party must elect between two courses of action, either continuing performance or ceasing performance. *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887–88 (Tex. App.-San Antonio 1996, writ denied). If the non-breaching party elects to treat the contract as continuing and insists the party in default continue performance, the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties. *Id.* at

887. Thus, "[t]reating a contract as continuing, after a breach, deprives the non-breaching party of any excuse for terminating their own performance."[7] *Id* at 888.

■ Here, appellant is attempting to avoid enforcement of the joint venture agreement by claiming EITI's two prior breaches excuse him from any further obligation. First, appellant claims EITI breached the contract because it did not satisfy the condition precedent of loaning appellant $18,000. The agreement provided the $18,000 loan was a prerequisite to the contract's validity and was to become effective September 1, 1995. Appellant argues the undisputed evidence proves he did not receive the full $18,000; thus, according to appellant, the joint venture agreement never became effective.

Second, appellant argues EITI breached the joint venture agreement because its predecessor, Northwest, transferred its interest in the joint venture to EITI in violation of the non-assignability clause. The transfer of interest from Northwest to EITI began in the early fall of 1995 and was officially consummated by the board of directors for each entity by the end of the year. EITI, however, began fulfilling the obligations of Northwest under the joint venture agreement in the fall of 1995. Because each alleged breach occurred no later than January 1996, we will look at appellant's conduct from that point forward to determine whether appellant treated the agreement as continuing after the alleged breaches had occurred.

Appellant testified at trial he sent a letter in May 1996 to EITI's representatives informing them he was taking over the billing pursuant to the terms of the agreement. Appellant also demanded payment for one-half of the salary for the physicist, as provided by the agreement, and, according to appellant, was paid in March 1996 pursuant to those demands. EITI continued to receive billing information from appellant until approximately April of 1996 so EITI could collect the billings pursuant to the agreement. Additionally, appellant counterclaimed against EITI for breach of third-party contract, claiming EITI failed to pay rent obligations, and therefore did not fulfill its obligations under the agreement. Appellant also testified, however, that he did not believe an agreement ever existed because EITI failed to loan appellant $18,000. Despite appellant's claim at trial that no agreement existed, he nevertheless testified that he continued to demand EITI's performance under the agreement. We conclude appellant elected to continue performance of the contract despite believing EITI breached the agreement.

Even were we to assume both allegations constitute material breaches of the joint venture agreement, both occurred at the beginning of the agreement, and the evidence demonstrates appellant elected to treat the contract as continuing after the alleged breaches and considered the agreement in full force and effect. Because appellant continued to demand performance, he too was fully obligated to perform

**7.** Although the non-breaching party must elect between continuing or ceasing performance, the election does not affect whether the non-breaching party can sue for a former or future breach. *Cal–Tex Lumber Co., Inc. v. Owens Handle Co., Inc.,* 989 S.W.2d 802, 812 (Tex.App.-Tyler 1999, no pet.); *see Chilton Ins. Co.,* 930 S.W.2d at 877–88; *Bd. of Regents of Univ. of Tex. v. S & G Constr. Co.,* 529 S.W.2d 90, 97 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.). The election affects only whether the non-breaching party itself is then required to perform fully. *See Chilton Ins. Co.,* 930 S.W.2d at 887–88; *S & G Constr. Co.,* 529 S.W.2d at 97. If the party continues performance, it obligates itself to fully perform. *See Chilton Ins. Co.,* 930 S.W.2d at 887–88; *S & G Constr. Co.,* 529 S.W.2d at 97.

under the agreement. Therefore, the evidence establishes as a matter of law appellant's failure to comply with the joint venture agreement was not excused. *See Chilton Ins. Co.*, 930 S.W.2d at 887–88.

■■■ Appellant also argues the evidence is legally and factually insufficient to support the jury's verdict that appellee did not fail to comply with the joint venture agreement.[8] Appellant, however, failed to challenge the legal or factual sufficiency of the evidence to support the jury's verdict in a motion for instructed verdict, a motion for judgment notwithstanding the verdict, an objection to the submission of the issue to the jury, a motion to disregard the jury's answer, or a motion for new trial. Therefore, appellant has waived any complaints as to the sufficiency of the evidence to support the jury's finding. Tex.R. Civ. P. 324(b); *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991).

Because we hold appellant's failure to comply with the joint venture agreement was not excused, we overrule appellant's second and third issues.

### Conclusion

Having overruled appellant's three issues on appeal, we affirm the judgment of the trial court.

---

8. Appellant did not raise an issue specifically challenging the jury's finding; however, such an attack is reasonably inferred from appellant's second and third issues and his conclusion in which he requests this court either to reverse and render judgment, or to reverse and remand the case to the trial court. *See* Tex.R.App. P. 38.1(e) (providing "an issue will be treated as covering every subsidiary question that is fairly included.")