United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 13, 2004**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

NO. 02-20017

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALICE MILES, RICHARD MILES and CARRIE HAMILTON,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas

_____

Before GARWOOD, JONES, and STEWART, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In October 1999, a federal grand jury in the Southern District of Texas filed a 32-count indictment charging Carrie Hamilton, Richard Miles, Alice Miles, and Harold Miles with multiple crimes related to fraud on the Medicare program. A jury acquitted Harold Miles, convicted Richard Miles of two mail fraud counts, and convicted Alice Miles and Carrie Hamilton of 28 and 29

counts, respectively.[1]  The three remaining defendants appeal on a variety of grounds, the most significant of which challenge their convictions for money laundering promotion and illegal Medicare kickbacks.  We reverse the money laundering promotion and kickback counts.  We also reverse the court's sentencing finding that Medicare is a "financial institution" within the meaning of U.S.S.G. 2B1.1(b)(12)(A).  We otherwise affirm the convictions and remand for resentencing.

## I.  BACKGROUND

Affiliated Professional Home Health ("APRO") was formed in 1993 in Houston, Texas by Carrie Hamilton, Alice Miles, and Richard Miles.  Richard Miles, a vice-principal of a Houston-area high school, was married to Alice Miles, a registered nurse, and is the brother of both Hamilton, also a registered nurse, and Harold Miles, an APRO employee.  When APRO obtained certification from the Texas Department of Health and a Medicare provider number, the company began to treat Medicare-covered patients and obtain reimbursement for in-home visits to such patients.

Medicare requires home health care providers to report their expenses and number of patient visits.  In turn, Medicare

---

[1]  Richard Miles was sentenced to 97 months imprisonment, three years of supervised release, 300 hours of community service, and a $200 special assessment.  Alice Miles was sentenced to 168 months imprisonment, three years of supervised release, and a $2,100 special assessment.  Carrie Hamilton was sentenced to 204 months imprisonment, three years of supervised release, and a $2,100 special assessment.  In addition, all three defendants were jointly and severally ordered to make restitution to the federal government in the amount of $4,292,246.72.

calculates a "per-visit" rate which it then uses to reimburse the home health provider over the next year.  At the end of each year, providers are required to submit their actual expenses to Medicare so that it can determine whether it has under- or overpaid the provider for that year.  The expenses reported by providers to Medicare include the direct costs of patient care, including salaries and employee benefits as well as general operating expenses such as office rent and equipment.  Indirect costs may be expensed to Medicare on a pro-rata basis according to the proportion of Medicare patients served by the provider.  Medicare also reimburses a wide variety of additional expenses incurred by home health care providers such as mileage incurred in travel to and from patient residences.  The touchstone for reimbursement is that costs must be reasonable, related to patient care, and necessary for the provider's business functions.  See 42 U.S.C. § 1395f(b); 42 U.S.C. § 1995x(v).

In an effort to promote efficiency despite the cost-plus nature of reimbursement, Medicare contracts with intermediary agencies to audit providers' cost reports.  Further, because the Medicare reimbursement system offers the not-so-wily criminal numerous avenues to defraud the federal government, intermediary agencies closely monitor provider reports for fraudulent activity. APRO's relationship with Medicare was conducted through Palmetto Government Benefits Association ("Palmetto"), a subsidiary of South Carolina Blue Cross/Blue Shield.

3

In this case, the Government presented evidence that the defendants, through APRO, submitted cost reports that grossly inflated expenses for items ranging from mileage to employee salaries. For example, Hamilton was reimbursed for a whopping 282,000 travel miles from 1994-1996, a period when she also frequently visited Louisiana casinos. Alice Miles, another avid gambler, was reimbursed for 150,000 travel miles over three years, while her husband, whose primary job kept him occupied for most of the work day, was reimbursed for 180,000 miles over four years.

APRO also obtained reimbursement for costs that included personal expenses such as renovations to the Hamiltons' home, renovations to the Miles' parents' residence, and various home appliances. Eventually, the amount of money coming in to APRO for fake charges became so large that in order to sustain the claimed level of expenses over the next year — so that APRO would not have to return overpayments to the federal government — the APRO principals began to use a variety of other methods to bilk Medicare out of taxpayer funds. These methods included their writing large-dollar checks to employees for "expenses" or "back pay" and then requiring the employees to cash the checks and hand the funds back to the APRO principals. Appellants billed expenses to Medicare for two or three times the actual cost incurred. At times, they engaged in more intricate schemes involving the splitting of large reimbursement checks into smaller cashier's checks which were then deposited into the APRO principals' bank accounts or used for

personal expenses.  On one occasion, Hamilton split an APRO check into cash and three cashier's checks at one bank.  She deposited two of the cashier's checks into her own account at another bank and used a portion of the funds to obtain a fourth cashier's check to purchase a new Ford Mustang convertible.  The third cashier's check from the original bank was cashed at the Star Casino.

Beginning in May 1997, Palmetto, the Health Care Financing Administration ("HCFA") and the Texas Department of Health systematically uncovered APRO's extensive effort to defraud Medicare.  That October, Medicare acted to stem the flow of federal funds to APRO by suspending its provider number.  APRO filed a federal lawsuit alleging racial bias on the part of HCFA and the Texas Department of Health.  The district court preliminarily enjoined Medicare to reinstate APRO's provider status pending the litigation, but this court reversed the grant of relief.  <u>See Affiliated Prof'l Home Health Care Agency v. Shalala</u>, 164 F.3d 282 (5th Cir. 1998).  In June 1998, federal agents executed a search warrant at APRO's premises and seized various business records.  The investigation and raid eventually led to the 32-count indictment filed against the four defendants and the convictions here at issue.

## II.  DISCUSSION

### A.  Money Laundering Promotion Convictions

5

Carrie Hamilton and Alice Miles were convicted on Counts 8-13 of the indictment, which charged them with aiding and abetting money laundering promotion, a crime perpetrated by anyone who

> . . . knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity.

18 U.S.C. § 1956(a)(1)(A)(I). This statute criminalizes all financial transactions that involve funds or property that are derived from specified illegal activity, where the transactions are intentionally aimed at promoting specified unlawful activity. The counts at issue here involved specific payments made by APRO for office rent (Counts 8 and 12), payroll (Count 11), and payroll taxes (Counts 9, 10 and 13). Both Hamilton and Alice Miles claim that the evidence adduced at trial was insufficient to support their convictions under this statute.

1.   **Standard of Review**

In evaluating whether the evidence produced at trial is sufficient to support a jury conviction, this court examines whether a rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt. See United States v. Rivera, 295 F.3d 461, 466 (5th Cir. 2002). In reviewing the evidence presented at trial, we draw all reasonable inferences in favor of the jury's verdict. Id. We do not evaluate

6

whether the jury's verdict was correct, but rather, whether the jury's decision was rational.  Id.

## 2.  Discussion

To sustain a conviction under the money laundering promotion statute, the Government must show that the defendant: (1) conducted or attempted to conduct a financial transaction, (2) which the defendant then knew involved the proceeds of unlawful activity, (3) with the intent to promote or further unlawful activity.  See United States v. Delgado, 256 F.3d 264, 275 (5th Cir. 2001).  Neither defendant argues on appeal that the financial transactions underlying Counts 8-13 were not in fact conducted, or that the funds used in these transactions were not, at least in part, the proceeds of unlawful activity.  Rather, both defendants contend that as the funds were used to pay APRO's "ordinary business expenses," the transactions do not demonstrate an intent to promote or further the Medicare fraud taking place at APRO.

In examining the question of intent necessary for a money laundering promotion conviction, this court has held that the Government must present either direct proof of an intent to promote such illegal activity or proof that a given type of transaction, on its face, indicates an intent to promote such illegal activity. See United States v. Brown, 186 F.3d 661, 670-71 (5th Cir. 1999). Absent such proof, this court has held that a defendant may not be convicted where the "proceeds of some relatively minor fraudulent transactions" are used to pay the operating expenses of "an

otherwise legitimate business enterprise." Id. at 671. In Brown, this court reversed the money laundering promotion convictions of a defendant who deposited fraudulently obtained funds in the operating account of a generally legitimate car dealership and used the funds to pay for a variety of legitimate business expenses.[2] The Brown court noted that a number of cases in this circuit have cautioned against allowing the "money laundering statute" to turn into a "money spending statute." See id. at 670 (internal quotation marks and citations omitted). As a result, the court held that strict adherence to the specific intent requirement contained in the text of the money laundering promotion statute is important to ensure that only "conduct that is really distinct from the underlying specified unlawful activity" is punished under this provision. See id. Brown emphasized that without such close scrutiny on the question of intent, the money laundering promotion statute would "simply provide overzealous prosecutors with a means of imposing additional criminal liability any time a defendant makes benign expenditures with funds derived from unlawful acts."

---

[2] The "above board" business expenses at issue in Brown were for:

(1) parts, paints, and materials; (2) the floor plan, cars that had been traded in, floor plan interest, and a charge back; (3) software support and office supplies; (4) conversions; (5) used cars; (6) disposal of waste oil and used oil filters; (7) t-shirts, caps, coffee mugs; (8) yearbook advertisements; (9) a computer system lease; (10) advertising representation; (11) Graves's travel expenses; (12) extended warranties on used automobiles; (13) glass replacement; (14) automobile association membership fees; (15) photocopier supplies; and (16) a health plan.

Brown, 186 F.3d at 668 n.13.

See id.  Such a result would be inconsistent with the overall statutory scheme created by Congress to address money laundering. See id. at 670-71 (discussing, e.g., a separate money laundering statute, 18 U.S.C. § 1957(a), which sets a $10,000 minimum on prosecutions for the mere expenditure of unlawfully obtained funds).

On the other end of the factual spectrum, however, are cases where, "[w]hen a business as a whole is illegitimate, even individual expenditures that are not intrinsically unlawful can support a promotion money laundering charge." See United States v. Peterson, 244 F.3d 385, 392 (5th Cir. 2001).  In Peterson, this court upheld the money laundering promotion conviction of a defendant who used fraudulently obtained funds to pay the general operating expenses of a business whose only purpose was to engage in fraudulent transactions.  Id. at 391-92.  The Peterson court distinguished the real estate sales business in that case from the car dealership in Brown because "all of the property owners who paid fees to [the real estate company] were treated to . . . fraudulent misrepresentations."  Id. at 391 (emphasis added). Indeed, in Peterson, fewer than one percent of the clients received any value for their fees.  This court characterized the real estate business in Peterson as "a sham and . . . [a] fraudulent tele-marketing scheme."  See id. at 388-90 (quoting United States v. Reissig, 186 F.3d 617, 619 (5th Cir. 1999)) (internal quotation marks omitted).

The question at issue here is whether a rational jury could find that APRO, as a whole, was an illegitimate business, such that otherwise normal and legitimate payments for rent (Counts 8 and 12), payroll (Count 11), and payroll taxes (Counts 9, 10, and 13) might properly be understood as evincing Carrie Hamilton's and Alice Miles's specific intent to promote money laundering. This case falls somewhere between Brown and Peterson in terms of the size and scope of the fraud in relation to APRO's legitimate business, but the particular payments for which the Government indicted APRO were quintessentially normal business expenditures.

It appears from the trial record that APRO did not simply exist to bilk the federal government out of money. APRO patients actually received the home health care services that Medicare contracted with APRO to provide. Even the Government's indictment avers that the money laundering activities did not begin until August 1995, nearly two years after APRO was approved by Medicare. Given that APRO was in business for four and a half years, from December 1993 through June 1998, and that actual patients received actual health care services, a rational jury could not find that APRO was a wholly illegitimate enterprise along the lines of the real estate scam in Peterson.

At the same time, however, it is important to note that the scale and scope of the fraud taking place at APRO certainly exceeded the "relatively minor fraudulent transactions" at issue in Brown. See Brown, 244 F.3d at 391. Ninety-five percent of APRO's

10

patients were Medicare beneficiaries, and an equivalent amount of its revenue during its entire existence derived from the Medicare program. The APRO defendants engaged in a wide range of activities that fraudulently overcharged Medicare and netted them a substantial amount of illicit revenue. The appellants were held jointly and severally liable for restitution of over $4 million in overcharges to Medicare.

While this substantial level of fraud provided a good reason for the Government's aggressive prosecution of the APRO principals, it does not suffice to prove their specific intent to promote the Medicare fraud by means of rent, payroll and payroll tax expenditures. Appellants' prosecution for these payments falls far closer to the facts in Brown than to Peterson. In Brown, as in this case, when a legitimate business pays customary, reasonable and legal operating expenses, neither it nor its principals should be subject to money laundering promotion for those payments. The crime of money laundering promotion is aimed not at maintaining the legitimate aspects of a business nor at proscribing all expenditures of ill-gotten gains, but only at transactions which funnel ill-gotten gains directly back into the criminal venture. To hold otherwise would be to ignore Brown's warning that the money laundering statute is not a mere money spending statute.

This is not to suggest that the government can never hold the principals of a legitimate business responsible for money laundering promotion. The correct distinction, for purposes of

11

inferring specific intent, is between payments that further or promote illegal money laundering with ill-gotten gains and payments that represent customary costs of running a legal business. See, e.g., Brown, 186 F.3d at 668 n.12 (noting that the government could have selected transactions such as the deposit of illegally obtained funds into a business account as the basis for a money laundering promotion charge rather than indicting appellant for the benign expenditures at issue there).

For these reasons, we **REVERSE** the convictions of Carrie Hamilton and Alice Miles on Counts 8-13 for money laundering promotion.

**B.    Medicare Kickback Convictions**

Carrie Hamilton and Alice Miles were also convicted on Counts 21-31 of the indictment, which charged them with paying healthcare kickbacks in violation of 42 U.S.C. § 1302a-7b(b)(2)(A), which provides that:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

This statute criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare

12

program. The appellants contend that the evidence was insufficient to support their convictions on these charges.

The government's case rested on evidence that APRO paid Johnnie and Melvin Jones, the owners of Premier Public Relations ("Premier"), to distribute information regarding APRO's home health services to doctors in the Houston area. The understanding between APRO and Premier provided that Premier would deliver literature and business cards to local medical offices. The Jones's also occasionally distributed plates of cookies to doctors' offices. When a physician determined that home health care services were needed for a patient, the physician's office might contact Johnnie Jones, who would then furnish APRO with the patient's name and Medicare number for billing purposes. APRO paid Premier $300 for each Medicare patient who became an APRO client as a result of Premier's efforts.

According to the Government, APRO's payments to Premier constituted improper kickbacks under the Medicare kickback statute. In order to obtain a conviction under this statute, the Government must show that a defendant: (1) knowingly and willfully made a payment or offer of payment, (2) as an inducement to the payee, (3) to refer an individual, (4) to another for the furnishing of an item or service that could be paid for by a federal health care program. See 18 U.S.C. § 1320a-7b(b)(2)(A) (2003). APRO's payments to Premier were based on the number of Medicare patients that APRO secured from Premier's activities. The only issue in

13

dispute is whether Premier's activities constituted referrals within the meaning of the statute.

The appellants assert that they cannot have violated this statute because Premier never actually referred anyone to APRO, but simply engaged in advertising activities on behalf of APRO. The statute, they contend, was designed to ensure that a doctor's independent judgment regarding patient care is not compromised by promises of payment from Medicare service providers. Premier did not unduly influence the doctors' decisions.[3]

Based on the evidence adduced at trial, we agree with the appellants. In this case, Premier supplied promotional materials to Houston-area doctors describing APRO's home health care services. After a doctor had decided to send a patient to APRO, the doctor's office contacted Premier, which then supplied the necessary billing information to APRO and collected payment. There was no evidence that Premier had any authority to act on behalf of

---

[3] Appellants also argue that their conduct might have violated a companion provision of the Medicare kickback statute which prohibits payments that are intended to induce a party to "purchase, lease, order, or arrange for or recommend purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B) (2003). Under this line of reasoning, APRO's payments to Premier might have been "recommendations" to doctors who then "referred" patients to APRO. Thus, their payments to third parties such as Premier may only be prosecuted under subsection (B), while payments directly to primary care providers must be prosecuted under subsection (A). Compare United States v. Polin, 194 F.3d 863, 865-67 (7th Cir. 1999) (subsections of the Medicare kickback statute "do not distinguish between physicians and lay-persons," but rather "refer to the difference between the referral of individuals (Subsection A) and the recommendation of specific services (Subsection B)").Regardless of any potential overlap in coverage by the two provisions, however, we need not speculate on its extent in this opinion because APRO's activities did not run afoul of the Subsection A crime with which they were charged.

14

a physician in <u>selecting</u> the particular home health care provider. Indeed, at least one defense witness testified at trial that Premier had no role in selecting the particular home health care provider but that the decision was made by the doctor's staff from among ten agencies, including APRO. The payments from APRO to Premier were not made to the relevant decisionmaker as an inducement or kickback for sending patients to APRO.

There are, however, certain situations where payments to non-doctors would fall within the scope of the statute. For example, in <u>Polin</u>, a pacemaker monitoring service made payments to a pacemaker sales representative based on the number of patients that he signed up with the service. <u>See</u> <u>id</u>. at 864-65. The salesman's responsibilities included selling pacemakers, attending implant procedures, and making sure that patients were monitored following implantation. <u>See</u> <u>id</u>. In fulfilling this latter responsibility, the salesman testified that when a physician decided to use an outside service, the salesman would contact a service provider and set up the monitoring for the patient. <u>See</u> <u>id</u>. at 865. That is, the salesman would make the decision as to <u>which</u> service provider to contact for the patient. The salesman in <u>Polin</u> admitted that he could be overruled by a physician, but he had never been overruled in the course of his fourteen-year career. <u>See</u> <u>id</u>. Under our reading of the statute, because the salesman in <u>Polin</u> was the relevant decisionmaker and his judgment was shown to have been improperly influenced by the payments he received from

15

the monitoring service, the Seventh Circuit correctly upheld the conviction of the individuals who paid the salesman in <u>Polin</u>. <u>Polin</u> is simply different from this case.

Because APRO's payments to Premier were not illegal kickbacks under 18 U.S.C. § 1302a-7b(b)(2)(A), we reverse the convictions of Carrie Hamilton and Alice Miles on Counts 21-31.

## C.    Financial Institution Fraud Enhancement

During sentencing, the district court applied a two-level enhancement under 2001 Sentencing Guideline 2B1.1(b)(12)(A) to Hamilton and Alice Miles.  This enhancement provides that where a defendant derives "more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by 2 levels."  <u>See</u> U.S.S.G. § 2B1.1(b)(12)(A) (2001).  The district court also applied a four-level enhancement to Richard Miles under 2000 Sentencing Guideline 2F1.1(b)(8)(B).[4]  All three defendants contend that Medicare is not a financial institution within the meaning of these guidelines.

The Government concedes that under a recent decision of this court, Medicare is not a "financial institution" within the meaning of the relevant guideline.  <u>See</u> <u>United States v. Soileau</u>,

---

[4]    The district court improperly applied the four-level enhancement under the 2000 Sentencing Guidelines to Richard Miles.  As Richard Miles was sentenced on December 20, 2001, the applicable guidelines were those promulgated by the Sentencing Commission as of November 1, 2001.  <u>See</u> 18 U.S.C. § 3553(a)(4)(A).  As a result, if the enhancement were applicable, Richard Miles should have been sentenced based on the same two-level enhancement that had been applied to Alice Miles and Carrie Hamilton, who were sentenced three days earlier.  The court's error is immaterial, however.

16

309 F.3d 877, 881 (5th Cir. 2002). While <u>Soileau</u> dealt with the 2000 Sentencing Guidelines, the relevant provision is in pertinent part identical in the 2001 Guidelines. We vacate the sentences containing this incorrect enhancement and remand for resentencing.

**D. Sophisticated Money Laundering Scheme Enhancement**

In sentencing Alice Miles and Carrie Hamilton, the district court applied the sophisticated money laundering enhancement under Guideline § 2S1.1(b)(3), which provides, inter alia, that if an "offense involved sophisticated laundering" the offense level may be increased by two levels. <u>See</u> U.S.S.G. § 2S1.1(b)(3) (2001). Both appellants challenge the application of this enhancement.

We review the district court's application of the sentencing guidelines de novo and its findings of fact under the clearly erroneous standard. <u>See</u> <u>Davidson</u>, 283 F.3d at 683. The guideline is relatively new and this court has not yet examined its application. However, this court has reviewed for clear error a district court's factual determination whether sophisticated means were used in the commission of an offense under another sentencing guideline. <u>See</u> <u>United States v. Powell</u>, 124 F.3d 655, 666 (5th Cir. 1997) (examining 1995 Sentencing Guideline § 2T1.1); <u>United States v. Clements</u>, 73 F.3d 1330, 1340 (5th Cir. 1996) (same). Clear error should be the standard in this case, too, because "layering" of transactions, which the court found to exist, is

defined as a form of sophisticated money laundering by the guidelines commentary. See U.S.S.G. § 2S.1.1, cmt. n.5(A) (2001).

The appellants' presentence reports utilize Hamilton's transaction involving the $45,000 check as one example of the basis for the enhancement. As discussed above, this transaction took place in a series of steps: (1) on April 8, 1997, APRO issued a check made payable to Hamilton for $45,000; (2) two days later, Hamilton took the APRO check and exchanged it for three cashier's checks and $6,000 in cash at Independence Bank; (3) that same day, Hamilton then deposited two of these checks in her account at Texas Commerce Bank and took a fourth cashier's check out from Texas Commerce Bank; (4) again, on the same day, this fourth check was used to purchase a brand-new Ford Mustang convertible; (5) and in her fourth transaction of the day, Hamilton cashed the third cashier's check (from Independence Bank) at the Star Casino.

The commentary to § 2S1.1 defines "sophisticated laundering" in part as "complex or intricate conduct . . . [which] typically involves the use of . . . (iii) two or more levels (i.e., layering) of transactions, transportation, transfers or transmissions, involving criminally derived funds that were intended to appear legitimate." See U.S.S.G. § 2S1.1, cmt. n.5(A) (2001). The commentary binds this court unless it is plainly erroneous or inconsistent with the guidelines. U.S. v. Urias-Escobar, 281 F.3d 165, 167 (5th Cir. 2002). It is true that Hamilton was not very successful in obscuring the source or

18

destination of the illegally-obtained funds used in this series of transactions. Nevertheless, the conduct Hamilton engaged in, even though inept, is paradigmatic "layering," a blatant attempt to hide the flow of taxpayer money to her private use. When an individual attempts to launder money through "two or more levels of transactions," the commentary clearly subjects an individual to the sophisticated laundering enhancement.

Alice Miles argues that her sentence cannot be enhanced under this provision because only Hamilton engaged in the underlying conduct. However, as the Government notes, the jury found Alice Miles guilty of participating in and aiding and abetting a wide-ranging conspiracy with Hamilton to defraud the federal government. One aspect of the scheme was to hide the source of illegally derived funds. Hamilton's particular transaction constituted merely one incident in the jointly undertaken activity, which was reasonably foreseeable to Alice. Given the panoply of evidence concerning both defendants' efforts to illegally obtain and conceal these funds, Alice Miles's sentence was properly enhanced under this guideline.

## E. Partial Jury Verdict Instruction

Appellant Richard Hamilton raises one conviction-related issue that merits discussion. He contends that the district court erred by not giving an <u>Allen</u> charge the first time the jury sent a note to the judge. Because the court failed to give the <u>Allen</u> charge on the first day of deliberations, Hamilton contends, a

second <u>Allen</u> charge, given after four days of deliberations, became coercive in nature.

Ordinarily we review a district court's decision to give an <u>Allen</u> charge for an abuse of discretion. <u>United States v. Lindell</u>, 881 F.2d 1313, 1320 (5th Cir. 1989) (standard of review for an <u>Allen</u> charge is abuse of discretion). However, where a defendant fails to object to the charge, the charge is reviewed for plain error. <u>Id</u>.

Richard Miles neither requested an <u>Allen</u> charge when the jury sent its first note out nor objected to the district court's response to the jury's first note. At least one reason for Miles's failure to propose an <u>Allen</u> charge is that the jury's first note did not suggest that an <u>Allen</u> charge was necessary. The note read, in part: "Your Honor, if we do not agree on a particular count (ex: 8 guilty and 4 not guilty) does that become a not guilty verdict on that particular count?" The district court, after conferring with the lawyers for both sides, responded, "If you do not agree on a particular court, that does not become a not guilty verdict on that particular count. To return a verdict on any count as to any defendant, whether your finding is guilty or not guilty, you must be unanimous."

Only when the fourth note from the jury arrived, indicating they were still deadlocked, and the judge expressed his intention to give an <u>Allen</u> charge, did Miles's counsel vigorously object that "the <u>Allen</u> charge is an invention of the devil and

20

should be consigned to hell." Given Miles's counsel's strong views on the impropriety of the <u>Allen</u> charge and his resultant objection to the charge, it is quite odd for Miles to suggest on appeal that the district court should have given the charge <u>earlier</u>, if at all.

In light of Miles's failure to request an <u>Allen</u> charge in the first instance, compared with his timely objection to the eventual <u>Allen</u> charge, whether the appropriate standard of review is plain error or abuse of discretion could be disputed. At the end of the day, however, we find no abuse of discretion and no error, plain or otherwise, in the district court's decision to give the <u>Allen</u> charge following the jury's fourth note. There is no basis for holding that the modified <u>Allen</u> charge given by the district court had any improper coercive effect on the jury.

## F.    Other Issues Raised by the Defendants

After a thorough review of the briefs and pertinent portions of the record, we find no merit in the various other issues raised by the appellants.

## III.    CONCLUSION

For the reasons discussed above, we reverse the convictions of Carrie Hamilton and Alice Miles on Counts 8-13 (money laundering promotion) and 21-31 (Medicare kickbacks). In addition, we vacate the sentences of all three appellants and remand for resentencing on the ground that Medicare is not a "financial institution" within the meaning of U.S.S.G. §

2B1.1(b)(12)(A), in addition to resentencing based on the reversal of the convictions noted above.  On all other grounds, we affirm the rulings of the district court, the jury verdict, and the other bases for the sentences imposed by the district court.

The judgment of the district court is **AFFIRMED** in part, **REVERSED** in part, and **VACATED** and **REMANDED** for resentencing.