

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00349-CV

WOUNDKAIR CONCEPTS, INC.,  APPELLANTS
DAN ANDERSON, AND KIM
ANDERSON

V.

RICHARD F. WALSH, MEDICA-  APPELLEES
RENTS CO., LTD., AND MED-RCO,
INC.

----------

## FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellants Woundkair Concepts, Inc., Dan Anderson, and Kim Anderson

sued Appellees Richard F. Walsh, Medica-Rents Co., Ltd., and MED-RCO, Inc.[2]

for breach of contract.  We will refer to the parties generally as "WCI" and

---

[1]See Tex. R. App. P. 47.4.

[2]MED-RCO is the general partner of Medica-Rents Co.

"Medica-Rents" except where context requires more specificity. The trial court granted summary judgment in favor of Medica-Rents. In three issues, WCI argues that the trial court erred by granting summary judgment, by finding that no party was entitled to relief, and by sustaining objections to the affidavit of Dan Anderson. Because we hold that the trial court erred by granting summary judgment, we reverse.

The Andersons own Woundkair Concepts, Inc. In 2004, the Andersons and Woundkair Concepts entered into a contract (Marketing Agreement) with Medica-Rents Co., Ltd. and Walsh (individually and as president of Medica-Rents's general partner[3]). The agreement provided that it was effective from November 1, 2004 to October 31, 2011.

The Marketing Agreement called for Woundkair Concepts to provide marketing services and for Medica-Rents to act as a supplier. Medica-Rents agreed to use Woundkair Concepts "as its exclusive marketing agent." Medica-Rents was to hire and maintain its own sales force "in its direct areas," but Medica-Rents salespeople were to "follow the direction of WCI sales management."

---

[3]Medica-Rents's answer stated that Walsh signed this agreement "as president of MED-RCO, the general partner of Medica-Rents, Inc." The agreement does not actually state the name of the general partner, however. It states that he signed as "President of the General Partner" of "Medica-Rents Co., Ltd."

In the agreement, Woundkair Concepts agreed to use Medica-Rents "as its exclusive supplier for ROHO mattresses, wound care supplies[,] and negative pressure wound therapy." The agreement made Medica-Rents responsible for providing product "for rental in acute care and home care venues" and "for sales to accounts and individuals in the WCI areas." The agreement further provided that Medica-Rents would bill for all product it provided and that Woundkair would not bill any entity for Medica-Rents's product without written consent from Medica-Rents. In the agreement, Medica-Rents agreed to pay a commission to WCI of twenty percent "of gross collected revenue from wound care programs promoted by WCI and billed through Medica-Rents[] (wound care dressings, negative pressure wound therapy[,] and supplies)."

In 2006, WCI sued Medica-Rents for breach of the Marketing Agreement. WCI alleged that in order to avoid having to pay commissions that were due under the agreement, Medica-Rents created alleged breaches by WCI of the Marketing Agreement to manufacture a reason to terminate the agreement.

Medica-Rents answered and filed counterclaims for breach of contract, conversion, unjust enrichment, as well as for a declaratory judgment that the Marketing Agreement was void for illegality. Medica-Rents then filed a motion for summary judgment asserting the defense of illegality, alleging that the contract

3

was unenforceable because it violated 42 U.S.C. § 1320a-7b of the federal Social Security Act[4] and, therefore, violated the public policy of Texas.

WCI responded that Medica-Rents had failed to prove each essential element of a violation of the Anti-Kickback Statute and that the evidence showed that WCI had not knowingly and willfully intended to violate the statute, that the agreement compensated them for acts that were not prohibited by the statute, and that the Marketing Agreement was exempted from the reach of the statute by a bona fide employment relationship among the parties.

The trial court signed an order granting summary judgment for Medica-Rents based on its finding that "the Marketing Agreement at issue in this lawsuit is an illegal contract and therefore violates the public policy of the State of Texas." The order further stated that "[a]ccordingly, . . . no party is entitled to any relief for any claims of any other party."

**Standard of Review**

We review a summary judgment de novo.[5] We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence

---

[4]42 U.S.C.A. § 1320a-7b (West Supp. 2011) ("the Anti-Kickback Statute"); § 1305 (West 2011) (stating that "[t]his chapter may be cited as the 'Social Security Act'").

[5]*Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

4

contrary to the nonmovant unless reasonable jurors could not.[6]  We indulge every reasonable inference and resolve any doubts in the nonmovant's favor.[7]  A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense.[8]  To accomplish this, the defendant-movant must present summary judgment evidence that conclusively establishes each element of the affirmative defense.[9]

**Analysis**

WCI argues in its first issue that the trial court erred by finding as a matter of law that the Marketing Agreement is an illegal contract and therefore violates the public policy of the State of Texas.

Neither party argues that the Marketing Agreement is ambiguous.  The construction of an unambiguous contract is a question of law for the court, which we review de novo.[10]  We must examine the entire agreement to determine the parties' intent and give effect to each provision so that none is rendered meaningless.[11]

---

[6]*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

[7]*20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

[8]*Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

[9]*See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008).

[10]*Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).

[11]*Id.*

A contract that cannot be performed without violating the law is void.[12]   But a contract that could have been performed in a legal manner will not be declared void merely because it may have been performed in an illegal manner or because illegal acts were committed in carrying it out.[13]   When two constructions of a contract are possible, a court should give preference to the construction that does not result in violation of the law.[14]   And when the illegality does not appear on the face of the contract, it will not be held void unless the facts showing its illegality are before the court.[15]

Thus, if the Marketing Agreement is not illegal on its face and could have been performed in a legal manner, then the trial court erred by finding as a matter of law that it is an illegal contract.[16]   And if the Marketing Agreement is susceptible to two constructions, one of which would require a violation of the law and one of which would not, we must give preference to the construction that does not result in violation of the law.[17]   We therefore consider the terms of the Marketing Agreement and the other summary judgment evidence to determine

---

[12]*Lewis v. Davis*, 145 Tex. 468, 472–73, 199 S.W.2d 146, 148–49 (1947).

[13]*Id.*; *Corporate Leasing Int'l, Inc. v. Groves*, 925 S.W.2d 734, 738 (Tex. App.—Fort Worth 1996, writ denied).

[14]*Lewis*, 199 S.W.2d at 149; *Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 752 (Tex. App.—Houston [14th Dist.] 2004, pet. denied).

[15]*Lewis*, 199 S.W.2d at 149; *Gupta*, 140 S.W.3d at 752.

[16]*See Groves*, 925 S.W.2d at 738.

[17]*See Lewis*, 199 S.W.2d at 149.

6

whether the trial court correctly determined that the Marketing Agreement is illegal as a matter of law.

Medica-Rents asserted in its summary judgment motion that the Marketing Agreement is void for illegality because it violates subsection (b)(1) of the Anti-Kickback Statute. This provision makes it a criminal offense when any person

> knowingly and willfully solicits or receives any remuneration . . . directly or indirectly, overtly or covertly, in cash or in kind—
>
> > (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.[18]

The Marketing Agreement provided that "Medica-Rents will use WoundKair Concepts, Inc. as its exclusive marketing agent during the term of this agreement," that WCI would manage certain territories, and that WCI would receive twenty percent "of gross collected revenue from wound care programs promoted by WCI and billed through Medica-Rents." The agreement does not define the terms "marketing," "managing," or "promoted," nor does it describe what WCI's duties would be under these provisions or what types of activities would be included.[19] Medica-Rents concedes that the Marketing Agreement

---

[18]42 U.S.C.A. § 1320a-7b(b)(1).

[19]*See Plano Surgery Ctr. v. New You Weight Mgmt. Ctr.*, 265 S.W.3d 496, 500–02 (Tex. App.—Dallas 2008, no pet.) (construing an agreement under which

7

does not on its face violate subsection (b)(1) and that "[n]othing in the [Marketing] Agreement explicitly requires the party to perform an illegal task." The question, then, is whether the summary judgment evidence shows as a matter of law that the Marketing Agreement could not be performed in a way that does not violate this provision of the Anti-Kickback Statute.[20]

As an initial matter, we consider Medica-Rents's assertion that WCI failed to preserve its argument that "[e]vidence outside the Agreement does not conclusively prove there is no way the Agreement can be performed in a legal manner" because it did not raise this argument in the trial court. Medica-Rents moved for summary judgment on the ground that the contract was void for illegality, and it was therefore Medica-Rents's burden to establish this affirmative defense as a matter of law.[21] If Medica-Rents did not meet this burden, then it was not entitled to summary judgment, and WCI was not required to challenge the legal sufficiency of Medica-Rents's summary judgment ground in the trial

---

PSC would manage day-to-day operations of a surgical center, New You would provide "marketing services," and the "net cash" from surgical services would be divided between the two and holding that the agreement was not facially illegal because neither "marketing services" nor "net cash" was defined in the agreement and the agreement could be performed lawfully by PSC paying New You a percent of "net cash" for "marketing services" not involving the violation of the statute at issue in that case).

[20]*See Lewis*, 199 S.W.2d at 149; *Gupta*, 140 S.W.3d at 752.

[21]*See Frost Nat'l Bank*, 315 S.W.3d at 508–09.

court in order to make that challenge on appeal.[22]  Furthermore, WCI's response asserted generally that Medica-Rents had failed to conclusively prove that the Marketing Agreement violated the Anti-Kickback Statute and asserted specifically that "the evidence does not conclusively prove that the agreement required [WCI] to engage in prohibited referrals or the furnishing of Medicare-reimbursable items."  WCI also asserted that the summary judgment evidence raised a fact issue on each element of the subsection of the Anti-Kickback Statute relied on by Medica-Rents.  We therefore reject Medica-Rents's contention that WCI failed to preserve its complaint for appeal.  We now review the summary judgment evidence provided by Medica-Rents to determine whether Medica-Rents met its burden of proof to show that the Marketing Agreement could not be performed without violating § 1320a-7b(b)(1).

Subsection (b) of the Anti-Kickback Statute is divided into two parts.  Subsection (b)(1) addresses recipients of remuneration (that is, individuals who *solicit or receive* remuneration *in return for* making referrals).  Subsection (b)(2) addresses the other side of the transaction:  individuals who *pay* or offer to pay remuneration in order to *induce* referrals.  Medica-Rents did not allege in its summary judgment motion that the Marketing Agreement violated subsection

---

[22]*See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979) (providing that on appeal, the nonmovant may challenge the legal sufficiency of the grounds raised in the summary judgment motion without first raising that challenge in the trial court).

9

(b)(2), and we therefore do not consider whether the agreement is illegal under that provision and consider only the applicability of subsection (b)(1).[23]

Subsections (b)(1) and (b)(2) are each further divided into two parts, with subparagraph (A) addressing the referral of individuals, and subparagraph (B) addressing the referral of services or goods.[24]  Thus, subsection (b)(1)(A) prohibits the referring of individuals for the furnishing (or for the arranging for the furnishing of) an item or service in return for receiving remuneration for that referral.  This provision would apply, for example, to a doctor who receives remuneration from a hospital in return for referring patients to the hospital.[25]  The Marketing Agreement would violate this part of the Anti-Kickback Statute if it called for WCI to receive remuneration in return for referring individuals to Medica-Rents for the furnishing of (or arranging for the furnishing of) Medica-Rents product, when the individual's payment for that product may be made by Medicare.[26]  In this case, no evidence shows that the Marketing Agreement could

---

[23]See *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) (stating that a summary judgment motion "must stand or fall on the grounds expressly presented in the motion").

[24]See *United States v. Polin*, 194 F.3d 863, 867 (7th Cir. 1999); *see also United States v. Stewart Clinical Lab., Inc.*, 652 F.2d 804, 806-07 (9th Cir. 1981) (construing the same language in a different section of the Social Security Act).

[25]See, e.g., *United States v. Borrasi*, 639 F.3d 774, 776 (7th Cir. 2011).

[26]See 42 U.S.C.A. § 1320a-7b(b)(1)(A) (prohibiting receiving remuneration "in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item . . . for which payment may be made in whole or in part under a Federal health care program").  The Anti-Kickback Statute does not refer specifically to Medicare, using instead the term "federal health care program."

10

not be performed without violating this section. No evidence showed that the Marketing Agreement required WCI to refer individuals for goods or services. Instead, the only evidence on this question is the testimony of the Andersons in which they stated that WCI did not did not refer individuals to Medica-Rents for the furnishing of Medica-Rents goods. Medica-Rents did not offer any evidence in contravention of the Andersons' testimony, such as testimony from Walsh, much less evidence establishing as a matter of law that the Marketing Agreement required WCI to obtain referrals or make sales.

Medica-Rents points to *Nursing Home Consultants, Inc. v. Quantum Health Services, Inc.* as support for its argument that the Marketing Agreement violated subsection (b)(1).[27] But the marketing agreement in that case differed from the one in this case. NHC served as an intermediary between nursing home residents and medical suppliers.[28] Quantum was a medical supplier that provided its supplies to nursing home patients.[29] The agreement between NHC and Quantum called for NHC "to identify Medicare recipients who needed the medical supplies that Quantum provided, and to put those recipients in contact

*See* 42 U.S.C.A § 1320a-7b(f) (defining "federal health care program"). For simplification and because the parties themselves refer to payments by Medicare, in this opinion we will use "Medicare" to mean any federal health care program that is implicated by the statute.

[27]926 F. Supp. 835 (E.D. Ark. 1996), *aff'd*, 112 F.3d 513 (8th Cir. 1997).

[28]*Id.* at 838.

[29]*Id.*

with Quantum."[30]  Quantum would then sell its products to the nursing home on behalf of the residents.  The agreement called for NHC to refer persons who needed supplies to Quantum, and those supplies were covered by Medicare.[31] The agreement therefore fell within the application (b)(1)(A).

In this case, however, the agreement did not on its face require WCI to refer persons who need Medicare-covered supplies (or anyone else) to Medica-Rents, and the evidence does not show that the agreement could not be performed without it doing so.  Because the evidence therefore did not show as a matter of law that the contract could not be performed without violating subsection (b)(1)(A), the trial court could not have properly granted summary judgment on this ground.[32]

An offense under subsection (b)(1)(B) may be committed based on a number of different behaviors.  First, WCI would commit a criminal offense if it received remuneration in return for purchasing, leasing, or ordering a product, if some or all of the payment for the product may come from Medicare.[33]  In reviewing the summary judgment evidence, we find no evidence that shows that

---

[30]*Id.* at 839.

[31]*Id.* at 843.

[32]*See Lewis*, 199 S.W.2d at 149 ("[W]here the illegality does not appear on the face of the contract it will not be held void unless the facts showing its illegality are before the court.").

[33]*See* 42 U.S.C.A. § 1320a-7b(b)(1)(B) (prohibiting the knowing and willful receipt of remuneration in return for purchasing, leasing, or ordering any item for which payment may be made in whole or in part under Medicare).

the Marketing Agreement required WCI to purchase, lease, or order Medica-Rents product (the payment for which may come from Medicare) in exchange for remuneration. The trial court therefore could not have properly granted summary judgment based on this part of the Anti-Kickback Statute.[34]

Subsection (b)(1)(B) also makes it a criminal offense to receive remuneration in return for *recommending* the purchase, lease, or ordering of a product, if some or all of the payment for that purchase may come from Medicare. Thus, the Marketing Agreement would fall within this provision's application if its performance required WCI to recommend Medica-Rents products to potential customers or to third parties who would in turn recommend Medica-Rents products to potential customers, if the payment for the products may come from Medicare.

Medica-Rents argues that the Marketing Agreement "requires Medica-Rents to pay commissions to Appellants based on [WCI's] promotion of Medica-Rents'[s] products." Assuming that Medica-Rents is arguing that this provision required WCI to recommend Medica-Rents products in violation of the statute, we conclude that Medica-Rents did not establish this ground for summary judgment as a matter of law.

Some evidence raises a surmise or suspicion that WCI may have had a role in direct marketing of Medica-Rents products, but it falls short of constituting

---

[34] *See Lewis*, 199 S.W.2d at 149.

13

a scintilla of evidence of the fact, much less of establishing that fact as a matter of law.[35]  Dan stated in his affidavit attached to WCI's response that Medica-Rents "purchased a $10,000 display booth for [WCI] to use at trade shows on behalf of Medica-Rents."  But Dan did not expound on what occurred at the trade shows and whether Kim or Dan made direct contact with customers or potential sources of referrals for Medica-Rents customers, and this evidence in no way showed that the Marketing Agreement required them to attend trade shows or perform direct marketing.

Medica-Rents also directed the trial court to Dan's testimony at a hearing. Although this part of Dan's testimony was not relied on by Medica-Rents in its summary judgment motion, we note that at that hearing, Dan stated that the Marketing Agreement contemplated that Medica-Rents would "eventually transfer all of their current offices and all of their employees under Woundkair Concepts" because "Medica-Rents no longer wanted to have its own sales force."  The agreement contained a section listing Medica-Rents offices that "are to be transitioned to WCI," but it contains no explanation of what the term "transitioned" meant or what the transition encompassed, and in any case Dan's testimony suggests that this transitioning was never completed.  Neither party points out or relies on this testimony in their briefs, and Medica-Rents did not direct the trial

---

[35] *See Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011) (stating that evidence is more than a scintilla if it would allow reasonable and fair-minded people to differ in their conclusions and that evidence that does no more than create a surmise or suspicion is no evidence).

court's attention to this part of the hearing testimony (or any specific part of the hearing testimony) as support for its arguments in its summary judgment motion. Even if Medica-Rents had relied on this evidence in support of its motion, we conclude that this testimony is too vague and ambiguous to constitute evidence that the Marketing Agreement called for WCI to recommend Medica-Rents product as prohibited by the Anti-Kickback Statute.[36]

On the other hand, WCI produced competent summary judgment evidence that WCI did not deal with potential purchasers and did not recommend the purchase of Medica-Rents products to anyone. Kim testified that rather than soliciting sources of referrals, she and her husband merely educated Medica-Rents salespeople and were paid a percentage of the revenues from the business generated by the Medica-Rents salespeople as a result of WCI's education. And in WCI's response to the summary judgment motion, it pointed out portions of Kim's and Dan's deposition testimony in which they testified that under the agreement, they did not personally market Medica-Rents's product. Kim testified that WCI "didn't obtain referrals" and that WCI "just educated [Medica-Rents sales staff] on sales technique and products."

Dan testified that WCI's "promotion" under the agreement did not include WCI actively marketing the product but rather in "locating opportunities and managing Medica-Rents sales personnel who actually marketed the products."

---

[36] *See id.*

15

Dan testified that by "locating opportunities," he meant that they would train Medica-Rents salespeople on how to identify possible customers, such as hospitals, long-term care facilities, or home health care providers. He stated that WCI did not try to locate patients who would use Medica-Rents products. And in Dan's hearing testimony attached by Medica-Rents to its summary judgment motion, Dan stated that the agreement called for WCI to be paid for managing employees, stating, "That is what the contract is for. Managing the sales force, that is what I got paid for."

Even if the evidence had shown that in practice WCI violated this provision of the Anti-Kickback Statute in its performance of the Marketing Agreement, nothing in the evidence relied upon by Medica-Rents or by the Andersons in response showed that WCI *could not* perform the contract without recommending Medica-Rents products to others. The trial court therefore could not have properly granted summary judgment based on this part of the Anti-Kickback Statute.[37]

Finally, the statute prohibits a party from receiving remuneration in return for *arranging* for the purchase, lease, or ordering of an item, the payment for which may come from Medicare. As stated above, the parties agree that the contract did not on its face implicate this subsection. But Medica-Rents argues that the summary judgment evidence showed that the Marketing Agreement

---

[37] *See Lewis*, 199 S.W.2d at 149.

nevertheless could not be performed without violating this part of the Anti-Kickback Statute.

In Medica-Rents's sur-reply brief, it contends that the evidence showed that the agreement violated the Anti-Kickback Statute's prohibition on "arranging for the furnishing of any item" for which payment may be made by Medicare. Medica-Rents argues that agreement makes WCI responsible for "'obtaining all paperwork for billing as well as documentation required by the account, carrier[,] or insurance company'" and that "[t]hus, [WCI] played a part in arranging for the ordering of Medica-Rents'[s] products by obtaining the necessary documentation, including insurance information." As it did in the trial court, Medica-Rents also points specifically to Kim's deposition testimony in which she stated that under the agreement, "We were going to be managing their facilities, employees, product placement, product pick up, service, maintaining Medica-Rents'[s] inventory, and managing Medica-Rents salespeople."

We disagree with Medica-Rents's view of the evidence. Kim's testimony and the language of the agreement do not indicate that the Marketing Agreement called for WCI to perform the kind of "arranging" prohibited by the statute. The "arranging" done by WCI appeared to be nothing more than completing necessary paperwork for the sales of Medica-Rents product made by Medica-Rents employees. The evidence, rather than establishing as a matter of law that WCI violated the Anti-Kickback Statute in its performance of the Marketing Agreement, at the least raised a fact issue about whether it performed in a legal

17

manner. And even if the evidence had not raised a fact issue about WCI's compliance with the law in its performance under the agreement, the summary judgment evidence did not show as a matter of law that it was not possible for the parties to perform under the Marketing Agreement without violating this part of the Anti-Kickback Statute.

The evidence, at the least, raises a fact issue on whether the commission payments to WCI in this case were to compensate WCI only for services rendered, not for activities prohibited by the statute, and were wholly attributable to WCI's provision of services to Medica-Rents.[38] The evidence does not establish as a matter of law that the agreement called for WCI to be compensated as an inducement to generate business payable by Medicare.[39] Instead, the evidence suggests that Medica-Rents employees generate the business and are the people doing the "arranging" that is governed by the Anti-Kickback Statute.

---

[38] *See United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989) (stating that it is a correct statement of the law that the Anti-Kickback Statute is violated unless the payment at issue was "wholly and not incidentally attributable to the delivery of goods or services").

[39] *Cf.* Advisory Op. No. 97-4, 1997 WL 34684552, at *4 (Dep't of Health & Human Servs. Office of Inspector Gen. Sept. 25, 1997) (stating that a provider's routine waiver of Medicare copayments may violate the Anti-Kickback Statute because when providers "forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they unlawfully may be inducing the patient to purchase items or services in violation of the anti-kickback statute's proscription against offering or paying something of value as an inducement to generate business payable by" Medicare).

Cases construing this statute do not suggest a different result. The Fifth Circuit, for example, has suggested that the statute only governs payments to decisionmakers and that if the payments at issue are not made to a person in a position to make referrals, then the payments are not prohibited by the statute.[40] Although the *Miles* court construed subparagraph (b)(2)(A) and expressly did not consider whether the activities in that case violated (b)(2)(B)—the counterpart to (b)(1)(B) with respect to the payment of remuneration for referrals—it does not appear that the court has expanded its application of the statute beyond payments to individuals who are in a decision-making position to refer individuals for services or to purchase goods or services and who could be improperly influenced by the payments.[41]

Other federal circuits take a broader view of the statute's application, but even cases from those circuits support our view that the statute does not apply to the type of "arranging" called for by the Marketing Agreement. In *United States v. Ruttenberg*,[42] for example, the Seventh Circuit stated the "obvious truisms" that Medicare kickback schemes not only increase costs to the government, but can also freeze competing suppliers from the Medicare system, mask the

[40] *See United States v. Miles*, 360 F.3d 472, 480 (5th Cir. 2004).

[41] See *id.* at 480 n.3 (noting the appellants' argument that their conduct may have violated (b)(2)(B) because their payments to a marketing service might have been "recommendations" to doctors who then "referred" patients to the appellants and declining to speculate on the correctness of the appellants' arguments because they had not been charged with a violation of (B)).

[42] 625 F.2d 173, 177 n.9 (7th Cir. 1980).

possibility of government price reductions, misdirect program funds, and provide "strong temptations to order more . . . supplies than needed."  Based on the summary judgment evidence, none of these concerns are implicated by the agreement here either on its face or in practice because the evidence does not show as a matter of law that WCI had any relationship with potential Medica-Rents customers or with sources of referrals of potential customers.

Similarly, the First Circuit has noted that "[t]he gravamen of Medicare Fraud is inducement" and that "[g]iving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient."[43]  Here, the summary judgment evidence suggested that WCI was not in any position to channel potential Medicare payments toward Medica-Rents.[44]

Furthermore, regulations promulgated by the Office of the Inspector General of the Department of Health and Human Services support the conclusion that the concern of the statute is to limit the opportunity to provide financial incentives in exchange for referrals.[45]  Medica-Rents did not produce sufficient

---

[43]*United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29 (1st Cir. 1989).

[44]*See also United States v. Greber*, 760 F.2d 68, 71 (3d Cir. 1985) ("The statute is aimed at the inducement factor.").

[45]*See* Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35,952, 35,953 (Dep't of Health & Human Servs. July 29, 1991) (stating that a proposed regulation "set forth a safe harbor provision for joint ventures and other arrangements involving payments for personal services or management contracts, but only if certain standards are met

summary judgment evidence to establish as a matter of law that the Marketing Agreement triggered application of the statute because the summary judgment evidence is that WCI did not make any referrals, nor did it make any recommendations to someone who is in the position to make referrals, and it was not required to do so by the agreement.[46]  Accordingly, the Marketing Agreement does not give the opportunity to provide financial incentives to WCI in exchange for referrals or recommendations.

The Inspector General has noted that with respect to marketing arrangements involving health care goods and services, "[p]ercentage compensation arrangements are potentially abusive . . . because they provide financial incentives that may encourage overutilization of items and services and may increase program costs."[47]  In this case, however, the concern raised by the Inspector General is not an issue because the summary judgment evidence is that under the Marketing Agreement, WCI only "arranged" for the ordering of Medica-Rents goods in that it processed the sales that had already been made

that limit the opportunity to provide financial incentives in exchange for referrals") (rules codified at 42 C.F.R. Part 1001).

[46]*Cf. Med. Dev. Network, Inc. v. Prof'l Respiratory Care/Home Med. Equip. Servs.*, 673 So. 2d 565, 566 (Fla. Dist. Ct. App. 1996) (holding illegal a contract under which PRC agreed to pay MDN a percentage of all business developed by MDN's marketing of PRC's durable medical supplies to clients and whereby MDN would contact users of medical equipment and promote the use of PRC's equipment); *see also Miles*, 360 F.3d at 480 n.3.

[47]Advisory Opinion No. 98-1, 1998 WL 35287756, at *4 (Dep't of Health & Human Servs. Office of Inspector Gen., Mar. 19, 1998).

by Medica-Rents salespeople. There is no opportunity for the agreement to encourage overuse of items or services or increase Medicare program costs because WCI did not sell product or point out sources of referrals.[48] The evidence does not show that WCI was required by the Marketing Agreement to do anything related to "arranging for" product purchases but take care of filling out paperwork and shipping Medica-Rents product.[49] The agreement simply does not provide any financial incentives to WCI in exchange for directing sources of business to Medica-Rents. Medica-Rents did not establish as a matter of law that the Marketing Agreement could not be performed without violating this part of the Anti-Kickback Statute.

In summary, the parties agree that the Marketing Agreement is not illegal on its face, and Medica-Rents did not establish as a matter of law that WCI could not perform the contract without violating § 1320a-7b(b)(1). Accordingly, the trial court could not have properly granted summary judgment on the ground that the Marketing Agreement was void for illegality under this part of the Anti-Kickback Statute.[50] We therefore hold that the trial court erred by granting summary judgment for Medica-Rents on the ground that the contract was illegal under

---

[48]*Cf. id.* (addressing a marketing agreement between A and B in which B was involved in active marketing, "including direct contacts . . . to physicians who order and dispense" the products made by A).

[49]*See* 56 Fed. Reg. 35,952, 35,973 (stating that percentage contracts or contracts based on overall volume are not per se violations of the statute).

[50]*See Lewis*, 199 S.W.2d at 149.

§ 1320a-7b(b)(1). Because we reach our holding based on Medica-Rents's failure to establish illegality as a matter of law, we need not reach WCI's argument that the agreement is not illegal because it falls within the "safe harbor" for bona fide employment relationships[51] or that Medica-Rents had to establish that WCI knowingly and willfully intended to violate the law by entering into the Marketing Agreement.

In its second issue, WCI argues that the trial court erred by finding as a matter of law that no party is entitled to any relief for any claims of any other party, leaving the parties as the trial court found them. WCI asserts that the trial court found that "no party is entitled to any relief" and that this finding was based only on the court's finding that the Marketing Agreement was illegal as a matter of law. Because we have held that the trial court erred by granting summary judgment, we overrule this issue as moot.

In its third and final issue, WCI argues that the trial court erred by sustaining objections to paragraphs two and four of Dan's affidavit. The objected-to portions of the affidavit were statements made by Dan relating to whether he and Kim had a bona fide employment relationship with Medica-Rents. Because we have held that the trial court erred by granting summary judgment

---

[51]*See* 42 C.F.R. § 1001.952 (2007) (providing that the term "remuneration" in the Anti-Kickback Statute "does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part" under Medicare).

because Medica-Rents did not meet its burden of proof to show that the Marketing Agreement is void for illegality, we need not consider whether the agreement fell within the safe harbor for employment relationships. We overrule this issue as moot.

**Conclusion**

Having sustained WCI's first issue, which is dispositive, we reverse the trial court's summary judgment and remand this cause to the trial court for further proceedings.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, GARDNER, and GABRIEL, JJ.

DELIVERED: March 22, 2012